UNITED STATES of America, Appellee,

v.

Irene ROSHKO, Defendant–Appellant.

No. 1100, Docket 91–1590.

United States Court of Appeals,
Second Circuit.

Argued March 17, 1992.

Decided July 17, 1992.

Stuart Holtzman, New York City, for defendant-appellant.

Richard J. Appel, New York City, Asst. U.S. Atty., S.D.N.Y. (Otto G. Obermaier, U.S. Atty., Daniel C. Richman, Asst. U.S. Atty., of counsel), for appellee.

Before: MESKILL, Chief Judge, TIMBERS and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

In theory the grand jury "belongs to no branch of the institutional government, serving as a kind of buffer or referee between the Government and the people", *United States v. Williams*, —— U.S. ——, ——, 112 S.Ct. 1735, 1742, 118 L.Ed.2d 352 (1992) (citing *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 274, 4 L.Ed.2d 252 (1960)), and the relationship between the grand jury and the courts "has traditionally been, so to speak, at arm's length." *Id.* Consequently, federal court review of grand jury proceedings is limited. *Id.* As a corollary, where a criminal defendant's substantial fifth amendment right "to be tried only on charges presented in an indictment returned by a grand jury" is threatened at trial, *Stirone*, 361 U.S. at 217, 80 S.Ct. at 273, we must be vigilant.

Today, we address the issues of whether at the trial of Irene Roshko the conspiracy

indictment was constructively amended, and whether, when properly limited to the grand jury's charge, her prosecution was barred by the statute of limitations. After a jury trial in the United States District Court for the Southern District of New York, Dominick L. DiCarlo, *Judge* of the United States Court of International Trade, sitting by designation, Irene, along with her husband, Meir, was found guilty of conspiring to defraud the government by making false statements to a government agency, *see* 18 U.S.C. § 1001 (1988), and by obstructing an Immigration and Naturalization Service ("INS") proceeding, *see* 18 U.S.C. § 1505 (1988).

Meir's appeal challenging, *inter alia,* his own conspiracy conviction, was argued before another panel of this court about eight weeks after the argument of this appeal. *See United States v. Meir Roshko*, 969 F.2d 9 (2d Cir.1992). The opinions in both cases, after having been circulated to all members of both panels, are being filed simultaneously.

## BACKGROUND

### A. *The Indictment.*

This prosecution arose out of Meir's successful acquisition of a green card which permits Meir, an immigrant from Israel, to reside permanently in this country. The prosecution's theory, maintained at trial and on appeal, was that Meir entered into a sham marriage with a United States citizen, Miriam Gershkowich, in order to obtain his green card. After Meir obtained the card in October 1984, he divorced Miriam and married Irene, also an alien, who eventually obtained an immigrant visa granting her permanent resident status in 1988. According to the government, Meir obtained his green card by falsely stating to the INS that he was living in a marital relationship with his first wife, Miriam, when, in fact, the couple never lived together and were married solely for the purpose of securing permanent resident status for Meir.

Initially, the grand jury returned a two-count indictment against Meir on May 9, 1990. Count I alleged that Meir had conspired to defraud the United States by making false statements to the INS, *see* 18 U.S.C. § 1001, and by obstructing that agency's proceedings, *see* 18 U.S.C. § 1505. Count II charged Meir with the substantive crime of making false statements to a governmental agency. *See* 18 U.S.C. § 1001.

In relevant part, the second paragraph of that indictment charged, among other things, that Meir had conspired to defraud the government

by seeking changes in the immigration status of *an alien* based on a sham marriage to a United States citizen that was falsely represented to be genuine. (emphasis added)

The means of the conspiracy, as alleged in the indictment, were the submission of false statements in INS forms and the obstruction of INS proceedings. The indictment alleged five overt acts in furtherance of the conspiracy:

a. On or about July 9, 1984, Valery Gershkowitz [*sic*] and Miriam Gershkowitz [*sic*] were divorced in Bronx, New York.

b. On or about July 23, 1984, MEIR ROSHKO and Miriam Gershkowitz [*sic*] were married in New York, New York.

c. On or about August 2, 1984, MEIR ROSHKO submitted Form I–485 to the INS in Manhattan.

d. On or about October 3, 1985, MEIR ROSHKO and Miriam Gershkowitz [*sic*] were divorced in Bronx, New York.

e. On or about October 25, 1985, MEIR ROSHKO and Irene Roshko were married in New York, New York.

On June 5, 1990, Meir's attorney wrote a letter to assistant United States attorney James Comey intended to memorialize their conference of the previous day. In particular, defense counsel wrote that the government had represented that "[t]he 'alien' referred to in paragraph 2 is the defendant", Meir Roshko. The government does not dispute the authenticity of this letter, or that it made such a representation.

On October 17, 1990, the grand jury returned a superseding indictment which added Irene as a co-defendant on the conspir-

acy count, but which in all other respects was virtually identical to the first count of the initial indictment that had named Meir only. The charge was the same: that the Roshkos had conspired to defraud the government

by seeking changes in the immigration status of *an alien* based on a sham marriage to a United States citizen that was falsely represented to be genuine. (emphasis added)

The means of the conspiracy were the same: the submission of false statements in INS forms and the obstruction of INS proceedings. Five of the six overt acts were the same: commencing with Miriam and Valery Gershkowich's divorce on July 9, 1984, and ending with the marriage of Irene and Meir on October 25, 1985. The sixth merely focused on Meir's wedding to Miriam.

The grand jury's only other revisions to the text of the original indictment were to add Irene as a defendant and then make technical, conforming amendments; for example, the word "defendant" was changed to "defendants". Significantly for this appeal, the grand jury did not alter the original indictment's reference to the "changes in the immigration status of *an alien* based on a sham marriage to a United States citizen" (emphasis added). Irene argues that the "alien" referred to in the indictment is Meir. The government, however, argues that the indictment also encompassed the change in Irene's immigration status, and therefore, that the indictment's reference to "an alien" in the singular refers to both Irene and Meir.

B. *The Evidence at Trial.*

The government at trial introduced evidence relating to the change in both Irene and Meir's immigration status. The prosecution's key witnesses were Miriam and Valery Gershkowich, the two unindicted co-conspirators. Miriam Gershkowich testified that she met Irene and Meir through mutual friends in the summer of 1984. At that point, Meir informed the Gershkowiches that he sought to stay in the United States permanently, and that he could do so by marrying Miriam, who was a United States citizen. In exchange for $2,800, Miriam and Valery agreed that they would obtain a divorce in order to allow Miriam and Meir to wed. Miriam and Meir were married on July 23, 1984.

Within a few weeks the newlyweds quickly sought to obtain permanent resident status for Meir. Miriam filed with the INS an I–130 form, which permits a United States citizen to sponsor an alien relative's application for permanent resident status; at the same time, Meir filed the required I–485 form. On the forms, the couple indicated that they were residing together in an apartment at 3205 Emmons Avenue in Brooklyn. Miriam, however, testified that after the marriage she continued to live with her first husband, Valery. Other witnesses testified that Meir lived with Irene during the period that he was married to Miriam.

Nevertheless, Miriam and Meir apparently posed as a happily married couple when they attended an interview with an INS immigration examiner on October 29, 1984. They repeated the false statements regarding their living arrangements to the unsuspecting INS official who, immediately after the interview, granted Meir's application for a green card.

Through the testimony of Miriam, the government sought to introduce evidence relating to events occurring after Meir obtained the green card, including Meir's divorce on October 3, 1985. The Roshkos objected, contending that Meir's receipt of the green card on October 29, 1984, had terminated the conspiracy and that evidence of events after that date was irrelevant. Noting that the divorce was "part and parcel of the agreement and the government's theory of the case", the district court overruled the objection. Similarly, the court allowed, over objection, evidence relating to Meir's subsequent marriage to Irene, and Irene's successful application for a green card.

At trial Irene argued that the five-year statute of limitations for conspiracies, *see* 18 U.S.C. § 3282 (1988), barred her prosecution. She claimed that the indictment charged a conspiracy to change the immigration status of *"an* alien", identified by the government earlier as Meir, and that the conspiracy therefore ended on October 29, 1984, when Meir received his green card. She argued that her prosecution, begun nearly six years later on October 17, 1990, was therefore time-barred. The government contended in opposition that the purpose of the conspiracy was to change the status of both Meir and Irene, so that it did not end until she obtained her immigrant visa on September 29, 1988, which granted Irene permanent resident status in the United States.

Recognizing that there were problems with the indictment, the district court nevertheless denied Irene's Fed.R.Crim.P. 29 motion and submitted the case to the jury, which found both Irene and Meir guilty of the conspiracy. In answer to special interrogatories, the jury explicitly found that the conspiracy included Meir's divorce as well as his subsequent marriage to Irene. The jury's finding in effect determined that the statute of limitations did not bar the prosecution. Judge DiCarlo sentenced Irene to five years' probation, including a six-month term in a residential community treatment center, a $6000 fine, and a $50 special assessment, and he stayed execution of the sentence pending appeal.

On appeal Irene argues that, by allowing the prosecution to present evidence and broaden the basis of the charge without giving limiting instructions, the district court permitted the indictment to be constructively amended in violation of the fifth amendment's grand jury clause. Moreover, she argues that the only legitimate prosecution permitted under the language of the indictment—conspiracy to change the immigration status of Meir—was time-barred, because the grand jury's indictment was filed more than five years after the conspiracy terminated. We agree, and therefore reverse the judgment of conviction and remand to the district court with a direction to dismiss the indictment as to Irene.

## DISCUSSION

The district judge grappled with the difficult issues posed by the government's poorly-drafted indictment. At one point, Judge DiCarlo understandably expressed to the assistant United States attorney "confus[ion] as to the way you draft indictments" and questioned why the government had failed to explicitly allege that the change in Irene's immigration status was an object of the conspiracy. In response, the assistant United States attorney realistically acknowledged:

> We could have saved everybody a lot of trouble if we had made the indictment go through '88, but there is the overt act that includes Mrs. Roshko that put everyone on notice that her adjustment was part of the conspiracy. I agree with the [district court] that it would have been a lot simpler to do it the way your Honor suggested.

In the past, we have admonished prosecutors to be especially careful in drafting indictments under 18 U.S.C. § 371 (1988). For example, in *United States v. Mollica,* 849 F.2d 723, 729 (2d Cir.1988), we explicitly warned the government that it can avoid fifth amendment violations in fraud cases by

> 'think[ing] through the nature of the crime it wishes to allege and then spell[ing] out the offense in a carefully drafted indictment, instead of confronting the defendant with its theory of criminality for the first time at trial.'

*Id.* (quoting *United States v. Weiss,* 752 F.2d 777, 795 (2d Cir.) (Newman, J., dissenting in part), *cert. denied,* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985)). We also noted that because the fraud statutes target a broad range of conduct, it is even more critical that reviewing courts be vigilant to ensure that the government does not attempt to broaden the "already perva-

sive and widesweeping nets of conspiracy prosecutions." *Id.* (citations omitted). Cognizant of this special responsibility, we must now decide whether the government, in seeking to improve what it conceded to be a troublesome indictment, introduced a new theory of criminality in violation of the fifth amendment's grand jury clause.

### A. *The Indictment was Constructively Amended.*

The fifth amendment states in relevant part that

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury * * *.

The Supreme Court in *Stirone,* 361 U.S. at 218, 80 S.Ct. at 273, noted that the purpose of the grand jury clause's requirement that a defendant be prosecuted only for those crimes set forth in an indictment is "to limit [her] jeopardy to offenses charged by a group of [her] fellow citizens acting independently of either prosecuting attorney or judge."

*Stirone* involved a Hobbs Act violation. The indictment alleged that interstate commerce was affected through Stirone's interference with interstate shipments of sand to a Pennsylvania concrete plant. *Id.* at 214, 80 S.Ct. at 271. At trial, however, the district court permitted the introduction of evidence establishing an alternative basis for the interstate commerce element unmentioned in the indictment, namely, that the Pennsylvania plant's concrete was used in the construction of a steel plant that subsequently shipped products into interstate commerce. *Id.* In other words, the evidence presented the trial jury with two possible theories as to the interstate commerce element of the case, but one of those theories had never been passed on by the grand jury. Noting that "it has been the rule that after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself", *id.* at 215–16, 80 S.Ct. at 272, the Court reversed Stirone's conviction because the indictment had been constructively amended at trial.

*Stirone,* then, stands for the proposition that an indictment is constructively amended where the proof adduced at trial "broadens the basis of conviction beyond that charged in the indictment." *United States v. Patino,* 962 F.2d 263, 265 (2d Cir.1992) (citing *United States v. Miller,* 471 U.S. 130, 144–45, 105 S.Ct. 1811, 1819–20, 85 L.Ed.2d 99 (1985)). However, a court may narrow an indictment at trial without violating the grand jury clause where "what was removed from the case was in no way essential to the offense on which the jury convicted." *Miller,* 471 U.S. at 145, 105 S.Ct. at 1820.

Since the constructive amendment, or broadening, of the charging instrument at trial "destroy[s] the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury", *Stirone,* 361 U.S. at 217, 80 S.Ct. at 273, it "is a *per se* violation of the grand jury clause of the Fifth Amendment" where such amendment affects "an essential element of the offense". *Patino,* 962 F.2d at 265–66 (citing *United States v. Zingaro,* 858 F.2d 94, 98 (2d Cir.1988))

Without question, the object of a conspiracy constitutes an essential element of the conspiracy offense. The statute itself provides in relevant part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more such persons do any act to effect the object of the conspiracy * * *.

18 U.S.C. § 371. Irene argues that the indictment's plain language clearly demonstrates that Meir's receipt of a green card was the principal and final object of the conspiracy, and that the government provided an alternative basis on which the jury could convict when it proved and argued at trial that her application for a green card was also such an object.

We agree with Irene's position for several reasons. First, when the superseding indictment referred to changes "in the immigration status of *an alien* based on a sham marriage to a United States citizen",

it referred to one alien, not two. Second, as Irene accurately points out, the only "sham marriage to a United States citizen" alleged in the indictment was the union between Meir and Miriam Gershkowich, a United States citizen. When Irene later married Meir, he was only a permanent resident alien, not a "United States citizen". Thus, any fair reading of the charges forces the conclusion that the alien referred to in the indictment was Meir, not Irene, and certainly not both.

Irene's position is effectively supported by the letter from Meir's counsel memorializing the discussion in which the government had confirmed that the "alien" referred to in the first indictment was Meir. The government would dismiss this letter as irrelevant because it was referring to the first indictment which named only Meir as a defendant. Nevertheless, after the grand jury returned its superseding indictment, the prosecution's explanation of the changes in an October 18, 1990, letter to the court was that it "simply" added Irene as a co-defendant.

In short, we are unpersuaded by the government's contention that when the grand jury wrote "an alien" it really meant "aliens", and we conclude that the superseding indictment targeted the change in the immigration status of Meir only.

We now turn to whether the evidence adduced at trial served to constructively amend the indictment. Despite the indictment's narrow language, the court permitted in evidence the forms that Irene had submitted to the INS to obtain her own permanent resident status in this country, which she secured in 1988. Additionally, the government argued to the jury that Irene's changed immigration status was part and parcel of the conspiracy alleged in the indictment. At opening argument, for example, the assistant United States attorney noted that after Meir had obtained his green card, he married Irene and

> then a similar procedure [to obtain permanent resident status] took place. Mr. Roshko, this time with his green card, served as the sponsor or the petitioner for Mrs. Roshko, and he went through the same or similar procedure.

A significant aspect of the prosecution's case, then, focused on the change in Irene's immigration status, and the government introduced a sizable body of evidence to support this uncharged contention. While the district court did not explicitly instruct that the alteration in Irene's status was an object of the conspiracy, it refused a defense request that the court charge that the "alien" referred to in the indictment be identified as Meir alone. Moreover, the district court admitted the evidence relating to Irene's application to the INS without any limiting instruction. *Cf. Zingaro*, 858 F.2d at 97 (court states issue as whether admission of evidence, "without any limiting instruction", constitutes constructive amendment). We conclude that such evidence could easily have created a basis for conviction which the grand jury did not intend to create.

We are unimpressed by the government's argument that no grand jury clause violation occurred because defense counsel were not "surprised" by the admission of such evidence. The substantial right implicated here is not notice; it is the "right to be tried only on charges presented in an indictment returned by a grand jury", *Stirone*, 361 U.S. at 217, 80 S.Ct. at 273, and violation of this right requires reversal of the conviction. The government would seemingly have us require a showing of prejudice to warrant a reversal, but there is no basis for this assertion.

B. *The Statute of Limitations Barred the Indictment.*

We now turn to whether the indictment against Irene should be dismissed as time-barred under 18 U.S.C. § 3282, which imposes a five-year statute of limitations on the crime of conspiracy. *See United States v. Brasco*, 516 F.2d 816, 818 (2d Cir.), *cert. denied*, 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975).

Irene claimed at trial and now on appeal that the main object of the conspiracy encompassed the change in Meir's immigration status which, she notes, was obtained on October 29, 1984, thus terminating the conspiracy. From this she argues that the

five-year statute of limitations for bringing the prosecution expired on October 29, 1989, approximately one year before the government filed the superseding indictment on October 17, 1990. The government, on the other hand, refuses to commit itself to a definite date on which the conspiracy terminated, but it contends that the conspiracy continued not only through Meir's October 3, 1985, divorce from Miriam, but also "up and through October 25, 1985, the day of Meir Roshko and Irene Roshko's marriage".

To determine when this conspiracy ended, we must scrutinize the facts of this case. *See, e.g., United States v. Hickey,* 360 F.2d 127, 141 (7th Cir.), *cert. denied,* 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966). As we noted in *United States v. Mennuti,* 679 F.2d 1032 (2d Cir.1982), our central inquiry should be

> the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy.

*Id.* at 1035 (emphasis in original) (quoting *Grunewald v. United States,* 353 U.S. 391, 397, 77 S.Ct. 963, 970, 1 L.Ed.2d 931 (1957)). Once we have ascertained the scope of the conspiracy, we must then determine when it terminated, keeping in mind that a conspiracy continues "until its aim has been achieved, it has been abandoned, or otherwise terminated." *United States v. Rucker,* 586 F.2d 899, 906 (2d Cir.1978).

The government argues that because "explicit reference in an indictment to a 'sham marriage' as a fraudulent device necessarily includes the contemplated divorce", the conspiracy here could not have ended until Meir and Miriam had severed their marital ties. The relevant precedents, however, indicate that where the object of a conspiracy is to change the immigration status of an alien, the conspiracy terminates when the alien secures the sought-after status. In *United States v. Rubenstein,* 151 F.2d 915 (2d Cir.), *cert. denied,* 326 U.S. 766, 66 S.Ct. 168, 90 L.Ed. 462 (1945), an alien wished to stay in the United States and Rubenstein assisted her by, among other things, preparing documents containing false statements that were submitted to the immigration authorities. The government charged the defendant with conspiracy. *Id.* at 916. Rubenstein challenged the admission of all evidence relating to the alien's divorce, which occurred after she had received her visa. Although "Rubenstein knew that the parties proposed a divorce" before assisting the wife in securing the visa, *id.* at 918, this court agreed with him that the "conspiracy * * * ended when [the alien] entered under the immigration visa." *Id.* at 917. While we held that evidence relating to the divorce was relevant and admissible to demonstrate the falsity of the defendant's representations to the immigration authorities, we nevertheless determined that the divorce in *Rubenstein* was not an act in furtherance of the conspiracy because it did not further the conspiracy's principal objective of altering an alien's immigration status.

The government feebly attempts to distinguish *Rubenstein* in a mere footnote. It argues that the Rubenstein indictment had "charged a conspiracy simply to obtain illegal entry", but that the Roshko conspiracy was broader because "the objectives of the conspiracy as charged include the obtaining of Meir Roshko's green card, his planned divorce from Miriam Gershkowich, and his marriage to Irene Roshko to enable her eventually to adjust her status." This broad view of the scheme, however, is simply not supported by the indictment which, as we discussed in Part I, *supra,* does not include Irene's acquisition of permanent resident status as an object of the conspiracy. Rather, as in *Rubenstein,* the object of this conspiracy was that, by making false statements to the INS and by obstructing that agency's proceedings, the conspirators sought to adjust the immigration status of a single alien, here, Meir. That singular objective, as alleged in the indictment, was achieved and the conspiracy terminated on October 29, 1984, when the INS approved Meir's application for a

green card. As in *Rubenstein,* the divorce was not necessary to the success of the scheme contemplated in this indictment.

Finally, we address the government's contention that the conspiracy was not completed until the conspirators received their "payoffs" for their participation. By this claim the government attempts to analogize the Roshko scheme to situations where the conspirators' general objective was the acquisition of money and where "the conspiracy [did] not end, of necessity, before the spoils [were] divided among the miscreants". *United States v. Knuckles,* 581 F.2d 305, 313 (2d Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978); *see also United States v. Fletcher,* 928 F.2d 495, 500 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 67, 116 L.Ed.2d 41 (1991). The government argues that Irene's "payoff" for participating in the conspiracy was her marriage to Meir and the subsequent adjustment of her own immigration status. All the cases on which the government relies, however, involve conspiracies for economic gain. *See, e.g., United States v. Potamitis,* 739 F.2d 784, 788 (2d Cir.), *cert. denied,* 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984) (in bank larceny case, "jury could infer from the evidence that acts to conceal and divide the proceeds were part and parcel" of conspiracy); *Mennuti,* 679 F.2d at 1035 (in mail fraud case, "conspiracy continues until the conspirators receive their payoffs"); *Knuckles,* 581 F.2d at 313 (in narcotics conspiracy "where a general objective of the conspirators is money", conspiracy does not end until conspirators divide proceeds); *United States v. Walker,* 653 F.2d 1343, 1350 (9th Cir.1981), *cert. denied,* 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982) (in bid-rigging case, conspiracy did not end with government award of timber contracts but with division of excess profits from sale of timber among conspirators).

*Mennuti,* on which the government relies most heavily, demonstrates that these cases are far different from the Roshko conspiracy, and that the "payoff" analogy has no application to this case. In *Mennuti,* the "payoff" was the product of mail fraud and arson; defendant's "sole reason for becoming involved in the scheme was to purchase the property at a low cost and then resell it at a profit." *Id.* at 1035. While the underlying mail fraud offense in *Mennuti* was completed when the insurance company mailed the check, the court explicitly noted that "even if the main objective of the conspiracy * * * was to defraud [the insurance company], the conspiracy continued until its other objectives, including Mennuti's own payoff, were achieved." *Id.* at 1036. That payoff was the purchase of the subject property at a bargain price.

Seen in this context, *Mennuti*'s holding that a "conspiracy continues until the conspirators receive their anticipated economic benefits", *id.* at 1035, makes a good deal of sense. But Mennuti acted in concert with the other conspirators after the completion of the underlying mail fraud offense in order to further the conspirators' general criminal objective of securing an economic windfall for themselves.

In contrast, Meir's divorce and subsequent marriage to Irene simply cannot be construed as the "spoils" or "payoffs" of the immigration conspiracy. In fact, the "payoff" for Miriam was the $2800 that Meir paid to the Gershkowiches for their participation in the scheme. While the government seems to argue that Irene's "payoff" was the eventual adjustment in her immigration status, the argument fails, because, as we have discussed in detail above, the grand jury did not allege that Irene's acquisition of permanent resident status was an object of the conspiracy.

## SUMMARY AND CONCLUSION

Meir's acquisition of a green card was the object of the conspiracy alleged in this indictment. The subsequent alleged overt acts—his divorce and his marriage to Irene—were superfluous to the success of that object, so that the conspiracy terminated on October 29, 1984, when the INS

issued a green card to Meir. Because that termination was more than five years before the grand jury returned its indictment, the indictment must be dismissed as barred by the statute of limitations. Consequently, we remand to the district court with a direction to dismiss the indictment · as against Irene Roshko.