UNITED STATES of America,

v.

Robert HITT, Defendant.

No. CRIM 99–0353 PLF.

United States District Court, District of Columbia.

July 14, 2000.

Lisa A. Prager, Asst. U.S. Atty., Washington, DC, for U.S.

Dan Marmalefsky, Morrison & Foerster, LLP, Los Angeles, CA, Eric J. Acker, Morrison & Foerster, LLP, San Diego, CA, for Defendant.

## OPINION

PAUL L. FRIEDMAN, District Judge.

Under the Fifth Amendment to the United States Constitution, "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury...." U.S. Const. amend. V. As a consequence, a defendant may be prosecuted only for the crimes actually set forth in the indictment returned by the grand jury. Defendant Robert Hitt moves to dismiss the indictment in this case as against him on the ground that the only crime with which he has been charged by the grand jury—conspiracy to commit specific statutory offenses against the United States, in violation of 18 U.S.C. § 371—is barred by the five-year statute of limitations. Because the indictment that was returned on October 19, 1999 unambiguously describes a conspiracy that ended with the granting of export licenses by the Department of Commerce on September 14, 1994, and because any broadening of the definition or scope of the conspiracy would constitute an impermissible constructive amendment of the grand jury's indictment, the Court must grant Mr. Hitt's motion and dismiss the indictment as against him.

## I. BACKGROUND

The defendants are charged in a sixteen-count indictment with deceiving the United States government in their applications to export to China a number of machining tools, large sophisticated pieces of equipment used in the production of aircraft parts. Count One of the indictment—the only count in which Mr. Hitt is charged—alleges a conspiracy among all of the named defendants extending from in or about February 1993 to in or about March 1995 with the goal of obtaining the necessary export licenses through false, fraudulent and misleading applications.

Counts Two through Sixteen allege violations of specific statutes in connection with the allegedly fraudulent acquisition of the licenses. In particular, the indictment alleges that the McDonnell Douglas defendants—McDonnell Douglas Corporation and Douglas Aircraft Company—and the CATIC defendants—Chinese National Aero–Technology Import and Export Corporation ("CATIC"), China National Aero–Technology International Supply Company, CATIC (USA) Inc., TAL Industries, Inc., Yan Liren and Hu Boru—made false and misleading statements to the United States government indicating that the machining tools were going to Chinese factories owned by CATIC that manufacture commercial aircraft when in fact the defendants knew that the machines were destined for other undisclosed factories (including some factories that manufacture military equipment) and that they concealed the true facts from the government, all in violation of 18 U.S.C. § 1001; the Export Administration Act and regulations, 50 U.S.C.App. § 2401 et seq., 15 C.F.R. § 768 et seq., and the International Emergency Economic Powers Act. 50 U.S.C. § 1701 et seq. Mr. Hitt is not charged with any of these substantive offenses.

The machining tools in question originally were installed in McDonnell Douglas' manufacturing plant in Columbus, Ohio. When McDonnell Douglas decided to close its Columbus plant in the early 1990's, it sought to sell off the equipment at the plant. CATIC immediately expressed interest in purchasing the machining tools,

and between December 1992 and February 1994, the companies negotiated a purchase contract for the tools, ultimately agreeing upon a price of $5.4 million. *See* Indictment ¶ 39. Mr. Hitt was instrumental in the negotiations for McDonnell Douglas and was well aware of the need to obtain export licenses with respect to the sale of the machining tools and equipment from the Columbus plant. *See* Indictment ¶ 39. On January 13, 1994, Mr. Hitt wrote a memorandum that stated in part: "The worst case scenario would happen if an export license was not obtained and the second package was not sold to CATIC. If this were to occur, [Douglas Aircraft] would have a potential loss of $3.2 million." Indictment ¶ 40. The government alleges that the McDonnell Douglas defendants ultimately agreed to the contract because, among other things, they wished to please the CATIC defendants in order to expand McDonnell Douglas' business enterprises in China, in particular in connection with the so-called trunkline program contract that was worth in excess of one billion dollars to McDonnell Douglas. *See* Indictment ¶ 35.

On or about May 26, 1994, defendants submitted ten applications to the Department of Commerce for licenses to export the machining tools to China.[1] The applications represented that the ultimate consignee (the end user) for the equipment was the CATIC Machining Company LTD in Beijing, China, and that the machining tools were to be used in connection with the trunkline program to produce 40 commercial aircraft in China (the end use). *See* Indictment ¶ 41. The Department of Commerce granted the export licenses on September 14, 1994. *See* Indictment ¶ 42.

In March 1995, acting in compliance with the conditions imposed on the export licenses by the Department of Commerce, McDonnell Douglas conducted an inspection of CATIC's facilities to ensure compliance with the terms of the licenses.

McDonnell Douglas discovered that several of the machine tools had been shipped to a manufacturing plant in Nanchang, China, a factory known to produce military equipment, instead of the intended location in Beijing. McDonnell Douglas reported the apparent violation to the Department of Commerce, which initiated its own investigation. That investigation resulted in the return of the indictment in this case on October 19, 1999.

## II. DISCUSSION

In a prosecution for conspiracy under 18 U.S.C. § 371, the statute of limitations begins running "from the last overt act during the existence of the conspiracy." *Fiswick v. United States*, 329 U.S. 211, 215, 67 S.Ct. 224, 91 L.Ed. 196 (1946); *see also Grunewald v. United States*, 353 U.S. 391, 397, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957) (prosecution must prove that "at least one overt act in furtherance of the conspiratorial agreement was performed within" the statute of limitations period). "Hence, ... the crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *Grunewald v. United States*, 353 U.S. at 397, 77 S.Ct. 963. The scope of the agreement charged by the grand jury and the overt acts taken in furtherance of it are defined by the text of the indictment. Absent the return of a superseding indictment, the government is bound to prosecute the crimes charged in the indictment and no others. *See Stirone v. United States*, 361 U.S. 212, 215–16, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) ("after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself"); *Gaither v. United States*, 413 F.2d 1061, 1072 (D.C.Cir.1969) (same); *see also Schmuck v. United*

1. Each application, and the allegedly false statements therein, is the subject of a separate criminal charge—Counts Four through Thirteen of the indictment.

*States,* 489 U.S. 705, 717, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) ("It is ancient doctrine of both the common law and of our Constitution that a defendant cannot be held to answer a charge not contained in the indictment brought against him").

 Mr. Hitt contends that the goal of the conspiracy as described in the grand jury indictment was to obtain the export licenses for the machining tools and that goal was achieved on September 14, 1994, when the Department of Commerce granted the licenses. Since the statute of limitations for conspiracy under 18 U.S.C. § 371 is five years, *see* 18 U.S.C. § 3282, and the indictment was not returned until October 19, 1999, he therefore maintains that the indictment against him is time-barred and must be dismissed.[2] The government disputes Mr. Hitt's reading of the indictment. It maintains that the indictment describes a conspiracy with a broader goal than simply the acquisition of export licenses: a conspiracy "to obtain machine tools for use in the People's Republic of China for uses to be determined by CATIC ... [a]nd not by the Department of Commerce." May 19, 2000 Transcript of Oral Argument at 20; *see also* Government's Opposition at 9.[3] Under this definition, the conspiracy's aim was not achieved until the machining tools arrived at the alternative locations in China—an event that occurred between November 1994 and March 1995, within the statute of limitations period.

The government also contends that, even if the goal of the conspiracy was to obtain the export licenses on September 14, 1994, the last overt act in furtherance of the conspiracy did not occur until CATIC reaped the economic rewards of the conspiracy. Under this argument, the last overt act in furtherance of the conspiracy also would be the arrival of the machining tools at the alternative locations in China. *See* Indictment ¶ 51(25).

### A. The Conspiracy Charged by the Grand Jury

 As much as the government attempts to mold the language of the indictment to its theories, the indictment actually returned by the grand jury simply does not support the government's reading. A section-by-section analysis of the indictment unavoidably leads the Court to the conclusion that the grand jury believed that the single goal of the alleged conspiracy was the acquisition of the export licenses from the Department of Commerce, which goal was achieved on September 14, 1994.

Any such analysis must start with paragraph 44 of the indictment, captioned "GOAL." Paragraph 44 states:

> *A goal of the conspiracy was to obtain export licenses allowing the sale and exportation of machine tools to the PRC.*
>
> **CATIC, CATIC/Supply, CATIC/US, TAL, Yan Liren** and **Hu Boru's** purpose, among others, was to obtain the

---

2. All other defendants have waived the statute of limitations. *See* Motion of Defendant Robert Hitt, Exh. D.

3. In its opposition brief, the government described the goal of the conspiracy as one to ensure the "completion of the contract." *See* Government's Opposition at 13. The government based this argument primarily on the title or heading of the section of the indictment consisting of paragraph 43: "SCHEME TO INSURE COMPLETION OF THE CONTRACT." *See* Indictment ¶ 43. The heading, however, is the only place in the entire indictment where the "completion of the contract"

is mentioned. Like a caption to an indictment, which is "mere surplusage," *United States v. Pazsint,* 703 F.2d 420, 423 (9th Cir. 1983); *see also United States v. Ebolum,* 72 F.3d 35, 39 (6th Cir.1995), the heading of a section of an indictment is largely surplusage and is irrelevant, particularly when there are no allegations or averments in the body of the indictment about such a scheme. The government appears to have recognized the infirmity in this argument and therefore has recast its view of the conspiracy as one to allow CATIC's unrestricted use of the tools in China.

Columbus plant machine tools for unrestricted use at undisclosed facilities within the PRC, including Nanchang, a factory known for its military production.

**McDonnell Douglas, Douglas Aircraft** and **Robert Hitt's** purposes, among others, were:

(a) to maintain the ongoing commercial relationship between **McDonnell Douglas** and **CATIC** and to promote the prospects for existing and future business contacts between the parties; and

(b) to obtain swift approval from the United States Department of Commerce of export license applications by presenting seemingly credible and non-controversial justification and end-user information in the license applications, even if such information was not truthful, so that **McDonnell Douglas** and **Douglas Aircraft** could avoid the storage costs provision and the buy-back provision of the Columbus asset sales contract between the parties.

Indictment ¶ 44 (italics added, bolding in original).

In paragraph 44, the grand jury clearly and simply stated what it believed to be the shared goal of all the co-conspirators: "to obtain export licenses." Indictment ¶ 44. In stark contrast to this statement of the shared "goal" of all conspirators, the grand jury then set out its views of the separate "purposes"—or, as the Court reads the indictment, the motives—of the individual co-conspirators. The grand jury clearly stated that only the CATIC defendants—and not the McDonnell Douglas defendants—had a motive of securing the unrestricted use of the machining tools at undisclosed facilities in China. If this motive was not shared by Mr. Hitt and the McDonnell Douglas defendants—and it is not alleged to have been—an agreement to achieve it could not have existed among them to support the government's proposed conspiracy. Since "[t]he existence of an 'agreement' is the essential element of the statutory crime of conspiracy," *United States v. Treadwell,* 760 F.2d 327, 336 (D.C.Cir.1985), the government "must establish a unity of purpose, an intent to achieve a common goal, and an agreement to work together [to achieve that common goal] in order to convict a criminal defendant of conspiracy." *United States v. Carr,* 25 F.3d 1194, 1201 (3d Cir.1994).

The conclusion that the grand jury viewed the agreement among the conspirators as one to obtain export licenses and nothing more is buttressed by paragraphs 18–42 of the indictment, entitled "BACKGROUND TO THE TRANSACTIONS." In this section, the grand jury described the factual background supporting the charges in the indictment, beginning with the opening of McDonnell Douglas' Columbus, Ohio plant in 1941 "to assist the United States in the production of fighter planes for World War II." Indictment ¶ 18. The section tracks the history of the machining tool operations of McDonnell Douglas' Columbus plant, including the negotiations between McDonnell Douglas and CATIC and the ultimate sale of the equipment. The story ends with paragraph 42, which states that the Department of Commerce granted export licenses for the machining tools on September 14, 1994. It therefore appears that the grand jury believed that the relevant acts of the defendants culminated with the issuance of the export licenses, as no further background was necessary on which to base the indictment's charges.

The indictment's list of overt acts taken in furtherance of the conspiracy further supports the conclusion that the grand jury believed the goal of the conspiracy and the agreement of the conspirators was to obtain export licenses from the Department of Commerce. In paragraph 51, the grand jury listed 25 overt acts that allegedly were taken in furtherance of the conspiracy. Only the last five occurred within the statute of limitations period:

(21) On November 2, 1994, **McDonnell Douglas** and **Douglas Aircraft** by D.B. from **Douglas Aircraft** signed two separate delivery sheets authorizing the removal of the licensable stretch press to destination "red" and authorizing the removal of licensing millling machines to destination "black."

(22) In or about November 1994, **CATIC** caused cargo that had been licensed for export to Beijing to be shipped on MV "Min He" and to be unloaded at two separate locations, Shanghai and Xinyang.

(23) In or about November 1994, **CATIC** caused another shipment of cargo that had been licensed for export to Beijing to be shipped to and unloaded at two separate ports, Shanghai and Xinyang.

(24) On or about February 18, 1995, **CATIC** caused the Verson stretch press, a machine tool licensed for export to Beijing, to be loaded onto the ship "Arturo Gomez" destined for shipment to Shanghai, PRC.

(25) Between in or about November 1994 and in or about March 1995, **CATIC** caused six machines licensed for export to Beijing to be delivered to Nanchang.

Indictment ¶ 51(21–25) (bolding in original).

Of the five listed acts, only one—overt act number 21—involved actions taken by any party other than CATIC. Overt acts numbers 22 to 25 all describe unilateral actions taken by CATIC to move machinery to undisclosed locations within China for unrestricted use and do not suggest in any way that there was an agreement among all the defendants to take such actions. Indeed, all of these alleged acts are consistent with the purpose or motive the indictment attributes to the CATIC defendants alone, as set forth in paragraph 44 of the indictment, and not with the overall goal of the conspiracy to which all defendants are alleged to have subscribed. *See supra* at 33. While overt act number

21 does allege that an unnamed employee of McDonnell Douglas approved a change in the shipment of the machinery, it does not allege or even imply that an agreement existed between CATIC and the McDonnell Douglas defendants (including Mr. Hitt) to divert the machinery. In the face of the grand jury's clear indication that it viewed the goal of the conspiratorial agreement to be to obtain export licenses, as set forth in paragraph 44, the inclusion of overt act number 21 in the list of overt acts cannot broaden the scope of the conspiracy beyond the one that is actually charged.

The grand jury's inclusion of these five acts does not make the indictment of Mr. Hitt timely unless these acts properly can be viewed as being taken in furtherance of the conspiracy actually charged or the agreement the alleged conspirators actually entered. *See Grunewald v. United States*, 353 U.S. at 391, 397, 77 S.Ct. 963. "[A] conspiracy continues 'until its aim has been achieved, it has been abandoned, or otherwise terminated.'" *United States v. Roshko*, 969 F.2d 1, 7 (2d Cir.1992). Because the indictment explicitly states that the goal of the charged conspiracy was "to obtain export licenses," the "aim" of the conspiracy described in the indictment was achieved with the granting of the licenses. *See id.* (conspiracy to change immigration status through sham marriage "terminates when the alien secures the sought-after status"); *United States v. Craft*, 105 F.3d 1123, 1128 (6th Cir.1997) (where object of conspiracy was to fabricate and backdate documents for filing in federal court, conspiracy terminated with filing of the documents). Since the goal of the conspiracy charged in the indictment—obtaining export licenses—was achieved before these five acts took place, they could not have been taken in furtherance of the conspiracy.

Finally, the indictment's description in paragraph 43 of the five specific offenses against the United States that the defendants are accused of conspiring to violate

also supports the Court's reading of the indictment as returned by the grand jury. Two of the offenses are expressly limited to acts taken "on or before August 20, 1994" and therefore encompass only actions taken outside of the statute of limitations period. Indictment ¶ 43(d), (e).[4] The description of a third offense states that defendants "willfully and knowingly [made] false and misleading statements and [concealed] material facts from the United States Departments of Commerce and Defense *in the course of obtaining export licenses . . . .*" Indictment ¶ 43(b) (emphasis added). An offense committed "in the course of obtaining export licenses" obviously could not encompass any acts done *after* the export licenses were obtained. *See Grunewald v. United States,* 353 U.S. at 396, 77 S.Ct. 963.

In describing the final two offenses, paragraph 43 uses language not so clearly temporally limited as the other three, but it is no more capable of embracing acts done after September 14, 1994. The first, an allegation that defendants conspired to make "materially false and fraudulent representations and to falsify, conceal and coverup by trick, scheme and device material facts in matters within the jurisdiction of the executive branch of the Government of the United States," in violation of 18 U.S.C. § 1001, might be read broadly to encompass allegations that defendants conspired to deceive the executive branch

after the granting of the export licenses. Indictment ¶ 43(a). Merely tracking the statute's language to provide a generic description of a Section 1001 violation, however—a standard indictment-drafting technique to assure that all bases are covered—cannot operate to add or expand the specific acts of deceit beyond those actually set out in the indictment. As the Court already has noted, the conspiracy count of the indictment does not allege any "false and fraudulent representations" or attempts to "falsify, conceal and coverup" material facts that occurred after the granting of the export licenses on September 14, 1994.[5] The breadth of the language used to describe the Section 1001 offense does not help the government's theory absent specific allegations of acts of false statements or concealment after that date in the indictment itself, and no such specific allegations appear. *See Fiswick v. United States,* 329 U.S. at 216–17, 67 S.Ct. 224 (duration of conspiracy to make false statements to United States is determined by overt acts "averred").[6]

The last offense described in paragraph 43 states that the defendants conspired to "use interstate wire communications, the mail and interstate carriers in furtherance of a scheme to defraud and to obtain property, that is export licenses and machine tools for delivery to the PRC, by means of false and fraudulent pretenses, representa-

---

4. The subparagraphs describing these two offenses allege that defendants violated the Export Administration Act, 50 U.S.C. § 2410 *et seq.,* and its regulations. The Act was repealed on August 20, 1994. *See* 50 U.S.C. § 2419. Although the government argues that it was entitled to enforce the EAA after August 20, 1994 pursuant to the International Emergency Economic Powers Act ("IEEPA"), *see* 50 U.S.C. § 1701 *et seq.,* the grand jury did not invoke IEEPA's authority when describing Count One of the indictment. Rather, the grand jury limited the scope of the alleged violations of the Export Administration Act to those acts occurring before the date of its repeal. The government may not ignore the plain language of the indictment and expand the definition of the offenses to include acts taken after August 20, 1994.

5. The government concedes that the false statements referenced in paragraph 43(a) are "primarily the export licenses." May 19, 2000 Transcript of Oral Argument at 28.

6. The substantive false statement count of the indictment charging McDonnell Douglas and Douglas Aircraft with a violation of 18 U.S.C. § 1001 (Count Three), while purporting to encompass acts committed "[f]rom in or about February 1993 until in or about March 1995," also makes reference only to specific false statements made in connection with the applications for and the granting of the export licenses. It refers to alleged misstatements made to and concealment of facts from the licensing offices before September 14, 1994, and none other. *See* Indictment at 39–43.

tions and promises," in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1341. Indictment ¶ 43(c). The grand jury must have viewed the scheme to defraud and to obtain property as one directed at the United States. The only other potential victim of the scheme would be the McDonnell Douglas defendants as the owners of the machining tools, and this indictment cannot reasonably be read to allege that one group of co-conspirators—the CATIC defendants—conspired to defraud and obtain the machine tools by means of false pretenses from another group of co-conspirators—the McDonnell Douglas defendants. If the alleged victim of the scheme was the United States, the only acts defendants allegedly took to deceive the United States and to obtain its property were those acts they allegedly took to obtain the export licenses. Indeed, even the government characterizes the mail and wire fraud offense described in paragraph 43(c) as a scheme "to submit seemingly credible information to the [Department of Commerce] in order to obtain export licenses." Government's Opposition at 36. The indictment therefore describes only a conspiracy with the goal of obtaining those licenses—a conspiracy that concluded on September 14, 1994. The government is bound by this definition of the conspiracy and may not alter it to salvage the untimely charge against Mr. Hitt. *See Gaither v. United States,* 413 F.2d at 1072.

### B. Economic Benefits Theory

■ The government nevertheless argues that, even under the Court's reading of the indictment, the charge against Mr. Hitt is not time-barred because the conspiracy did not end until the parties received the anticipated economic benefits from the conspiracy. When a conspiracy is intended to gain money or other economic benefits for the conspirators, the final overt act does not occur until the conspirators receive their last payment of the conspiracy's spoils. *See, e.g., United States v. Girard,* 744 F.2d 1170, 1172 (5th Cir.1984) (conspiracy did not end until last

payment when conspirator's "interest lay not in securing the contract itself, but in obtaining the money thereunder"); *United States v. Mennuti,* 679 F.2d 1032, 1035 (2d Cir.1982) (where conspiratorial agreement not limited to acquiring insurance check but also included payoff to each conspirator, conspiracy continued until conspirators received their payoffs). The government therefore contends that the conspiracy in this case did not end until CATIC received the economic benefit of the receipt of the machinery, arguing that McDonnell Douglas' "continued cooperation in the shipping process was essential in order for CATIC to achieve its desired goal of getting the machine tools to China. . . . [N]either party received the benefit of the bargain until March of 1995, when the tools were actually delivered to a location in China of CATIC's own choosing." Government's Opposition at 25–26.

■ An anticipated benefit of a conspiracy, however, extends the conspiracy's duration only if that benefit was known and intended by all of the conspirators to be a consequence or objective of the conspiracy. *See United States v. Girard,* 744 F.2d at 1171–74 (all conspirators involved in bid rigging conspiracy were aware of objective of receiving payment from rigged contract and had as one stated objective obtaining Housing Authority funds under contact); *United States v. Mennuti,* 679 F.2d at 1034 ("conspiratorial agreement . . . included a payoff to each conspirator"). As the indictment in this case clearly states, however, the grand jury thought that only the CATIC defendants, and not the McDonnell Douglas defendants, intended the conspiracy to result in the unrestricted use of the machinery at undisclosed facilities in China. *See* Indictment ¶ 44, quoted *supra* at 32–33. The two motives ascribed to the McDonnell Douglas defendants—to maintain their ongoing commercial relationship with the CATIC defendants and to obtain swift approval of the export licenses—were both fulfilled when the Department of Commerce granted the export

licenses. *See id.* By contrast to the cases cited by the government, this case is much more akin to *United States v. Roshko,* 969 F.2d at 8, where the court concluded that a conspiracy to change a person's immigration status ended when the person's status was changed and did not extend to the resulting benefits of the change in status that were enjoyed by one of the co-conspirators. As there was no shared intent or goal to receive continuing economic benefits from the conspiracy alleged in the indictment, the conspiracy charged by the grand jury concluded when its objective—the receipt of the export licenses—was achieved on September 14, 1994.

\* \* \* \* \* \*

■ In the end, the indictment before the Court is the product of the grand jury's deliberations and vote. "The content of the charge, as well as the decision to charge at all, is entirely up to the grand jury." *Gaither v. United States,* 413 F.2d at 1066. While it is common wisdom that the prosecutor presents evidence to the grand jury and drafts proposed indictment language for the grand jury's consideration, the power to indict is held by the grand jury, not by the prosecutor, and it is the grand jurors' meaning and intent that controls. "[A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him," *Stirone v. United States,* 361 U.S. at 217, 80 S.Ct. 270, and an indictment that requires a prosecutor or judge to "guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the granting of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." *Russell v. United States,* 369 U.S. 749, 770, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *see Gaither v. United States,* 413 F.2d at 1067. If the government is permitted to expand the scope of the alleged conspiracy beyond what the grand jury's language makes clear was the grand jury's intent, the constitutional safeguard that is the grand jury will be lost. The conspiracy as found by the grand jury in this case concluded on September 14, 1994. The charge against Mr. Hitt therefore is barred by the statute of limitations and must be dismissed.

An Order consistent with this Opinion will be issued this same day.

SO ORDERED.

### ORDER

Upon consideration of the motion of defendant Robert Hitt to dismiss the indictment on statute of limitation grounds, the oppositions and replies thereto and the arguments of counsel at the May 19, 2000 motions hearing, and for the reasons stated in the Opinion issued this same day, it is hereby

ORDERED that the motion of defendant Robert Hitt to dismiss the indictment on statute of limitation grounds is GRANTED; and it is

FURTHER ORDERED that the indictment is DISMISSED as against defendant Robert Hitt.

SO ORDERED.