**UNITED STATES of America, Appellant,**

v.

**Robert HITT, Appellee.**

**No. 00–3083.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 22, 2001.

Decided May 8, 2001.

**1012**

Chrisellen R. Kolb, Assistant U.S. Attorney, argued the cause for appellant. With her on the briefs were Wilma A. Lewis, U.S. Attorney, at the time the brief was filed, John R. Fisher, Roy W. McLeese, III and Steven J. Durham, Assistant U.S. Attorneys.

Andrew L. Frey argued the cause for appellee. On the brief were Dan Marmalefsky and Eric M. Acker.

Before: WILLIAMS and ROGERS, Circuit Judges, and SILBERMAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge ROGERS.

Dissenting opinion filed by Circuit Judge WILLIAMS.

ROGERS, Circuit Judge:

On October 19, 1999, the Grand Jury returned a sixteen-count indictment for alleged fraudulent misrepresentations made to the United States Department of Commerce in connection with the sale by the McDonnell Douglas Corporation to the People's Republic of China of machinery that was subject to export controls. Count One of the indictment charged Robert Hitt, the Director of the China Program Office at Douglas Aircraft Company, a wholly-owned subsidiary of McDonnell Douglas, along with other defendants, with conspiring to violate the laws of the United States, in violation of 18 U.S.C. § 371 (2000), by deceiving the United States government in the process of completing the sale of the equipment. The district court ruled that the conspiracy alleged in Count One ended on September 14, 1994, when the Department of Commerce issued the export licenses required to sell the machinery, and that the prosecution of Hitt was therefore barred by the five-year statute of limitations. *See United States v. Hitt,* 107 F.Supp.2d 29, 30 (D.D.C.2000); *see also* 18 U.S.C. § 3282 (2000). The government appeals. We affirm.

**I.**

The indictment states that in the early 1990s, McDonnell Douglas closed a manufacturing plant located in Columbus, Ohio that had produced military aircraft for the United States. *See* Count One ¶¶ 18–19. After closing this facility, McDonnell Douglas and Douglas Aircraft Company (jointly, "MDC") began negotiations with the China National Aero–Technology Import and Export Corporation ("CATIC") and some of its subsidiaries[1] for the sale of

1. The CATIC subsidiaries named in the indictment are the China National Aero–Technology International Supply Company ("CATIC/Supply"), located in Beijing; CATIC (USA) Inc., a wholly-owned subsidiary of CATIC located in El Monte, California; and TAL Industries, Inc., a wholly-owned subsidiary of CATIC/US located in El Monte, California.

various pieces of equipment from the plant. *See* Count One ¶¶ 21–39. Among the equipment in which CATIC expressed an interest were several "machining tools"—"large sophisticated pieces of equipment used in the production of aircraft parts." Count One ¶ 19. These tools were subject to export controls and required export licenses from the United States Department of Commerce. *See* Export Administration Act of 1979, 50 U.S.C. app. §§ 2401–2420 (1991); Export Administration Regulations, 15 C.F.R. §§ 768–99 (2001).[2] Upon learning that the Department of Commerce strongly discouraged MDC's sale of the equipment, *see* Count One ¶ 26, MDC, through its legal department, informed CATIC that the requisite export licenses "would not be obtainable." Count One ¶ 28. CATIC, in turn, sought assistance from Robert Hitt "in resolving the export license problem related to the sale of the [machine tools]." Count One ¶ 29. As Director of the China Program Office, Hitt was responsible for implementing the "trunkline program,"[3] a $1 billion contract between MDC and CATIC for the manufacture of commercial aircraft in China. *See* Count One ¶ 35. This contract gave MDC and Hitt a vested financial interest in maintaining a favorable business relationship with CATIC and the Chinese government. *See* Count One ¶¶ 35–36. When CATIC encountered difficulties in its negotiations with MDC for the Columbus equipment, CATIC alluded to the trunkline contract. *See* Count One ¶ 35. MDC reacted to this pressure from CATIC, at one point admitting "that negotia-

tions with CATIC were being conducted due to the pending $1 billion trunkliner program. If not for the trunkliner, the slow paced negotiations ... would be broken off in favor of auctioning equipment." Count One ¶ 38.

On February 15, 1994, MDC and CATIC entered into a Purchase Agreement, under which MDC would sell to CATIC various pieces of equipment from the Columbus plant, including the machine tools that were subject to export controls, for $5.4 million. *See* Count One ¶ 39. Under the Agreement, MDC was responsible for applying for and obtaining export licenses where necessary, and CATIC was responsible for shipping and exporting all machine tools that required an export license. *See* Count One ¶ 39. In addition, the contract specified that title to the equipment would pass from MDC to CATIC by July 5, 1994, "[u]pon completion of removal from the Columbus, Ohio facility, and receipt by MDC of the final thirty-five percent (35%) payment required." The contract also provided that the equipment must be removed from the Columbus plant by July 5, 1994, or MDC was required to pay for storage of the equipment at another location. *See* Count One ¶ 39(2).

On or about May 26, 1994, MDC and CATIC representatives submitted ten export license applications to the Department of Commerce. *See* Count One ¶ 41. Each application included (1) an application form, in which MDC represented that the end-user for the equipment was the

CATIC is a People's Republic of China government-formed corporation located in Beijing. *See* Count One ¶ 8. We refer to these defendants as "the CATIC defendants," and to the People's Republic of China as "China."

2. Although the Export Administration Act expired on August 20, 1994, the government maintains that the export controls mandated by the Act remained in force pursuant to a

series of Executive Orders. Because the instant appeal addresses solely Hitt's statute of limitations challenge, the court has no occasion to address this matter.

3. The indictment refers to the project as both "trunkline" and "trunkliner." *See, e.g.,* Count One ¶¶ 35, 38, 40, 41. We refer to the program as "trunkline."

CATIC Machining Company in Beijing; (2) an "Export Justification" statement, indicating that the machine tools would be "used in the trunkline program in conjunction with the production of 40 commercial aircraft in [China]," Count One ¶ 41(b); and (3) an "end-user and end-use statement," prepared by CATIC representatives, stating that the equipment would be used to produce parts for the trunkline program. Count One ¶ 41(d). Based on the information submitted by MDC and CATIC, the Department of Commerce granted the export licenses on or about September 14, 1994. *See* Count One ¶ 42. The licenses authorized the export of the equipment for use at the CATIC Machining Center in Beijing for purposes of the trunkline program. The licenses also required MDC to verify the equipment's location and usage by performing quarterly inspections of the CATIC facility and submitting quarterly reports to the United States Government for a two-year period.

After MDC and CATIC obtained the licenses, CATIC arranged, on or about November 7, 1994, to ship the machine tools to two separate points in China (contrary to the terms of the export license), and ultimately to ship the equipment to a factory in Nanchang, China that is allegedly involved in the manufacture of military equipment. *See* Count One at ¶¶ 44, 47(*l*)-(n), 49, 51(21)-(24). On April 4, 1995, shortly after MDC's required quarterly inspection of the CATIC facility, MDC reported to the Department of Commerce that the machine tools had been diverted to four different locations, including the Nanchang facility. The government initiated an investigation, which culminated in

the indictment returned on October 19, 1999.

The indictment charged one conspiracy Count and fifteen substantive Counts.[4] Hitt was charged only in Count One, which charged him, MDC, CATIC, and two CATIC employees with conspiring to violate the laws of the United States, in violation of 18 U.S.C. § 371, and with aiding and abetting such a conspiracy, in violation of 18 U.S.C. § 2. Counts Two through Fifteen charged the corporate defendants— MDC, CATIC, and their affiliates—with statutory violations in connection with the allegedly fraudulent acquisition of the export licenses: Count Two charged false statements by the CATIC · defendants; Counts Three, Fourteen, and Fifteen charged false statements by MDC in connection with the applications for the export licenses; and Counts Four through Thirteen charged all corporate defendants with false statements and violations of various export statutes. Count Sixteen charged the CATIC defendants with making false and misleading statements to the Department of Commerce after the export licenses were issued.

Hitt moved to dismiss the charges against him on the grounds that the conspiracy alleged in Count One extended only to the United States' September 14, 1994, issuance of the export licenses and was therefore time barred. The government opposed the motion, arguing that the conspiracy continued until the machine tools were shipped to China in or about March 1995. The district court ruled as a matter of law that the conspiracy alleged in the indictment ended when the United States issued the export licenses, and that

---

4. Counts Two and Three charged violations of the False Statements Act, 18 *U.S.C.* § 1001 (2000); Counts Four through Fifteen charged violations of the Export Administration Act, 50 U.S.C. app. § 2410(a) and of 15 C.F.R. §§ 787.5 and 87.5; and Count Sixteen

charged violation of the International Economic Emergency Act, 50 *U.S.C.* § 1705(b) (1991) and 15 C.F.R. § 787.5. In addition, all Counts charged a violation of 18 U.S.C. § 2 (2000) for aiding and abetting.

prosecution of Hitt was therefore barred by the five-year statute of limitations for conspiracy. *See Hitt,* 107 F.Supp.2d at 30; 18 U.S.C. § 3282. The government appeals pursuant to 18 U.S.C. § 3731 (2000).

## II.

"A conspiracy is a partnership in criminal purposes." *United States v. Kissel,* 218 U.S. 601, 608, 31 S.Ct. 124, 54 L.Ed. 1168 (1910). The general federal conspiracy statute prohibits conspiracies "to commit any offense against the United States" or "to defraud the United States ... in any manner or for any purpose."[5] 18 U.S.C. § 371. To prosecute a defendant under § 371, "the government must prove beyond a reasonable doubt that: (1) two or more persons formed an agreement either to commit an offense against or defraud the United States; (2) the defendant knowingly participated in the conspiracy with the intent to commit at least one of the offenses charged or to defraud the United States; and (3) at least one overt act was committed in furtherance of the common scheme." *United States v. Treadwell,* 760 F.2d 327, 333 (D.C.Cir.1985); *see also United States v. Wilson,* 160 F.3d 732, 737 (D.C.Cir.1998); *United States v. Gatling,* 96 F.3d 1511, 1518 (D.C.Cir.1996). The five-year statute of limitations for a § 371 prosecution, *see* 18 U.S.C. § 3282, begins running "from the last overt act during the existence of the conspiracy." *Fiswick v. United States,* 329 U.S. 211, 216, 67 S.Ct. 224, 91 L.Ed. 196 (1946); *see also Grunewald v. United States,* 353 U.S. 391, 397, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

For the indictment to be timely with respect to Hitt, it must show that no more than five years prior to the filing of the indictment (i.e., at a point no earlier than October 19, 1994) (1) the conspiracy, as contemplated by the agreement, still existed, and (2) at least one overt act in furtherance of the conspiracy occurred. *See Grunewald,* 353 U.S. at 397, 77 S.Ct. 963. In examining whether these conditions are fulfilled, "the crucial question ... is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *Id.* at 397, 77 S.Ct. 963; *see also United States v. Bayer,* 331 U.S. 532, 542, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947). Key to determining the scope of the conspiracy—and dispositive in the instant appeal—is the extent to which there was a "meeting of minds" concerning the object of the conspiracy. *United States v. Rosenblatt,* 554 F.2d 36, 38 (2d Cir.1977) (quoting *Krulewitch v. United States,* 336 U.S. 440, 448, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring)); *see also Treadwell,* 760 F.2d at 336. "This does not mean that the conspirators must be shown to have agreed on the details of their criminal enterprise, but it does mean that the 'essential nature of the plan' must be shown." *Rosenblatt,* 554 F.2d at 38 (quoting *Blumenthal v. United States,* 332 U.S. 539, 557, 68 S.Ct. 248, 92 L.Ed. 154 (1947)).

To determine the scope of the alleged conspiratorial agreement, the court is bound by the language of the indictment. *See generally Grunewald,* 353 U.S.

---

**5.** The conspiracy statute provides:
> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more such persons do any act to effect the object of the conspiracy each shall be fined under this title or imprisoned not more than five years, or both.
>
> 18 U.S.C. § 371.

at 397, 77 S.Ct. 963; *see also United States v. Craft,* 105 F.3d 1123, 1127–29 (6th Cir. 1997); *United States v. Roshko,* 969 F.2d 1, 6–9 (2d Cir.1992). Adherence to the language of the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury. *See Russell v. United States,* 369 U.S. 749, 768–71, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *Stirone v. United States,* 361 U.S. 212, 216, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *United States v. Lawton,* 995 F.2d 290, 292–93 (D.C.Cir.1993). As the Supreme Court has explained, an indictment's main purpose is "to inform the defendant of the nature of the accusation against him." *Russell,* 369 U.S. at 767, 82 S.Ct. 1038. To this end, an indictment must "first, contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend, and, second, enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (citing *United States v. Debrow,* 346 U.S. 374, 74 S.Ct. 113, 98 L.Ed. 92 (1953); *Hagner v. United States,* 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932)). It is hence well-established that a defendant "cannot be held to answer a charge not contained in the indictment brought against him." *Schmuck v. United States,* 489 U.S. 705, 717, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989); *see also Stirone,* 361 U.S. at 215–17, 80 S.Ct. 270; *United States v. Krasovich,* 819 F.2d 253, 254–55 (9th Cir.1987).

Upon examining the text of the indictment, the district court concluded that "the grand jury believed that the single goal of the alleged conspiracy was the acquisition of the export licenses from the Department of Commerce, which goal was achieved on September 14, 1994." *Hitt,* 107 F.Supp.2d at 32. On appeal, the government contends that the true goal of the conspiracy extended to the actual export and delivery of the machinery to unauthorized locations in China. The government maintains that the district court failed to construe the indictment as a whole, *see, e.g., United States v. Inryco, Inc.,* 642 F.2d 290, 294 (9th Cir.1981), incorrectly regarded portions of the indictment as surplusage, *see, e.g., United States v. Rezaq,* 134 F.3d 1121, 1134 (D.C.Cir.1998), and invaded the province of the jury by determining that certain overt acts within the statutory period did not further the goal of the conspiracy. *See United States v. Wilson,* 26 F.3d 142, 159 (D.C.Cir.1994). Specifically, the government maintains that the district court disregarded several key portions of the indictment indicating that the common goal of all defendants was to export the machinery: (1) the latter portion of the first sentence in Paragraph 44, which alleged that "[a] goal of the conspiracy was to obtain export licenses *allowing the sale and exportation of machine tools to [China]"* (emphasis added); (2) the heading in Paragraph 43—"Scheme to Insure Completion of the Contract"; (3) statements of "Manners and Means" (¶¶ 47–50) and "Overt Acts" (¶ 51(21)-(25)) that refer to the shipment and delivery of the tools to China, which occurred as late as March 1995 and thus were within the statute of limitations period; and (4) the explicit reference in Paragraph 43 to March 1995.

We review *de novo* the district court's legal conclusion concerning the scope of the conspiracy. *See United States v. Dolan,* 120 F.3d 856, 864 (8th Cir.1997); *United States v. United Med. & Surgical Supply Corp.,* 989 F.2d 1390, 1398 (4th Cir.1993). Consistent with our obligation to adhere to the language of the indictment, and an indictment's primary purpose of providing notice of the specific

charges to the defendant, we hold that the alleged conspiracy charged in Count One ended with the issuance of the export licenses on September 14, 1994. The indictment's references to subsequent events do not point to acts in furtherance of the alleged conspirators' common goal and therefore may not be relied upon to extend the conspiracy to a period within the statute of limitations. *See Grunewald,* 353 U.S. at 405–06, 77 S.Ct. 963; *Fiswick,* 329 U.S. at 216–17, 67 S.Ct. 224.

**A. Structure of Count One.** Count One of the indictment begins with an "INTRODUCTION" that states in relevant part:

> On or about September 14, 1994, the United States Department of Commerce granted 10 export licenses to [MDC] permitting [MDC] to export 13 large pieces of machinery ... to [China] for use by ... [CATIC]. The defendants ... made material false, fraudulent and misleading statements and material omissions on the applications, the end user certificates and in additional oral and written submissions upon which the Department of Commerce based its decision to issue the 10 export licenses. [The Chinese corporate defendants] caused 6 of the 13 pieces of machinery to be diverted to an unauthorized factory in Nanchang, [China], known to be used for military production.

Count One ¶ 1. Count One proceeds to review the regulatory framework for the MDC–CATIC transaction, *see* Count One ¶¶ 2–6; describe the equipment subject to export controls, *see* Count One ¶ 7; and identify the defendants, *see* Count One ¶¶ 8–17. After providing this context, the indictment sets forth the "Background to the Transactions." *See* Count One ¶¶ 18–42. The "Background" details MDC's negotiations with CATIC for the sale of the equipment from the Columbus plant; MDC's vested financial interest in main-

taining a favorable relationship with CATIC in light of the $1 billion trunkline program; and MDC's and CATIC's submission of the materials necessary for obtaining the requisite export licenses. *See id.* The background discussion ends with the United States' issuance of the export licenses on or about September 14, 1994. *See* Count One ¶ 42.

Two key paragraphs follow. Paragraph 43 describes "THE CONSPIRACY," and is subtitled "Scheme to Insure Completion of the Contract." Paragraph 43 states:

> From in or about February, 1993 ... until in or about March 1995 ... the defendants ... did unlawfully, willfully and knowingly combine, conspire, confederate and agree together to commit offenses against the United States, that is:
>
> a. to willfully and knowingly make materially false and fraudulent statements and representations and to falsify, conceal and coverup [sic] by trick, scheme and device material facts in matters within the jurisdiction of the executive branch of the Government of the United States ... in violation of [18 U.S.C. § 1001];
>
> b. to willfully and knowingly make false and misleading statements and to conceal material facts from the United States Departments of Commerce and Defense in the course of obtaining export licenses in violation of [50 U.S.C. app. § 2410(a) and 15 C.F.R. § 787.5];
>
> c. to use interstate wire communications, the mail and interstate carriers in furtherance of a scheme to defraud and to obtain property, that is export licenses and machine tools for delivery to [China], by means of false and fraudulent pretenses, representations and promises in violation of [18 U.S.C. §§ 1343 and 1341];

d. to possess, before on or about August 20, 1994, machine tools with the intent to export them having reason to believe that they would be exported in violation of an export control imposed under Section 5 or 6 of the Export Administration Act, in violation of [50 U.S.C. app. § 2410(b)(3) and 15 C.F.R. § 787.1(a)(ii)(C)]; and

e. to buy and sell, before on or about August 20, 1994, machine tools to be exported from the United States subject to the Export Administration Regulations with knowledge or reason to know that a violation of the Export Administration Act is intended to occur with regard to the transaction, in violation of [50 U.S.C. app. § 2410(a) and 15 C.F.R. § 787.4(a)].

Count One ¶¶ 43.[6]

Paragraph 44 states the "Goal" of the conspiracy:

A goal of the conspiracy was to obtain export licenses allowing the sale and exportation of machine tools to [China]. [The CATIC defendants'] purpose, among others, was to obtain the Columbus plant machine tools for unrestricted use at undisclosed facilities within [China]. . . . [MDC] and Robert Hitt's purposes, among others, were: (a) to maintain the ongoing commercial relationship between [MDC] and CATIC and to promote the prospects for existing and future business contracts between the parties; and (b) to obtain swift approval from the United States Department of Commerce of export license applications by presenting seemingly credible and non-controversial justification and end-user information in the license applications, even if such information was not truthful, so that [MDC] could avoid the storage costs provisions and the buy-back provision of the Columbus asset sales contract between the parties.[7]

Count One then lists the "Manners and Means" that the defendants used "in seeking to achieve the goal of the conspiracy."[8] Count One ¶ 45. Paragraphs 46 through 48 describe the false and misleading information supplied by the CATIC defendants regarding the machine tools' end user and end use. Paragraphs 49 and 50 describe the false information to which MDC and Hitt certified in the applications and the information that they concealed from Commerce Department officials.

Finally, Paragraph 51 lists twenty-five alleged "Overt Acts" committed by the defendants "[i]n furtherance of the conspiracy and to accomplish the objects thereof." These include (1) Hitt, MDC, and CATIC's false and misleading statements to government officials while applying for the export licenses; (2) MDC's filing of the allegedly fraudulent export

---

**6.** Paragraph 43 refers to August 20, 1994, only to indicate that at the outset of the alleged conspiracy the Export Administration Act was in effect and had not yet been repealed by Congress.

**7.** As evidence that MDC's (and Hitt's) actions were in part fueled by a desire to avoid these costs, Count One relies on a January 13, 1994, memorandum, allegedly written by Hitt, which states that "if an export license [were] not obtained . . . [MDC] would have a potential loss of $3.2 [million] . . . [and] any costs to store the assets past 1 May 1995 would have to also be assumed by [MDC]."

Count One ¶ 40. After the government noted its appeal, it was brought to the government's and the court's attention that the memorandum was not authored by Hitt. The government no longer relies on Paragraph 40, and absent this evidence, it is unclear if the Grand Jury would attribute to Hitt all purposes listed in Paragraph 44(b). For purposes of this appeal, we will assume that the Grand Jury would.

**8.** Although Paragraph 44 refers to "[a] goal," the only goal described in Count One appears in Paragraph 44.

license applications; and (3) CATIC's efforts to divert the machinery to unauthorized locations. Five of these alleged overt acts occurred after the export licenses were issued:

(21) On November 2, 1994, [MDC] signed two separate delivery sheets authorizing the removal of [some licensable machine tools] to destination "red" and [some licensable machine tools] to destination "black."[9]

(22) In or about November 1994, CATIC caused cargo that had been licensed for export to Beijing to be shipped [to and unloaded at two separate locations].

(23) In or about November 1994, CATIC caused another shipment of cargo that had been licensed for export to Beijing to be shipped to and unloaded at two separate ports....

(24) On or about February 18, 1995, CATIC caused ... a machine tool licensed for export to Beijing[] to be ... [shipped] to [an unauthorized location].

(25) Between in or about November 1994 and in or about March 1995, CATIC caused six machines licensed for export to Beijing to be delivered to Nanchang.

Count One ¶ 51(21)-(25). Only Overt Act No. 25 refers to a date as late as March 1995. Only Overt Act No. 21 refers to MDC. The "delivery sheets" that Overt Act No. 21 alleges MDC signed are not alleged to be shipping authorization documents; rather, they are internal MDC records of CATIC's contractually-obligated removal of certain machine tools from the Columbus plant. The remaining four overt acts within the statutory period, Overt Acts No. 22 through 25, relate solely to CATIC's efforts to ship the machine tools to unauthorized locations after MDC obtained the requisite export licenses.

From the plain language and structure of Count One, it would follow that "The Conspiracy" envisioned by the Grand Jury was confined to the defendants' false statements and concealment of information from Commerce Department officials while applying for the export licenses. The "Goal" of the conspiracy, as described in Paragraph 44, did not encompass any event occurring after the export licenses' issuance on September 14, 1994. Because Count One did not allege that MDC and Hitt shared the separate purpose of the CATIC defendants to divert the machine tools in violation of the export licenses, the conspiracy was, as the district court concluded, completed once the export licenses were issued. *See Hitt,* 107 F.Supp.2d at 30; *see also Krasovich,* 819 F.2d at 255–56.

█ Notwithstanding the Grand Jury's plain statement of the one common goal of the conspiracy in Paragraph 44, and its statement of the separate purposes of the MDC and the CATIC defendants, the government maintains that the alleged conspiracy continued until the machine tools were shipped and delivered to China in March 1995. In support of this contention, the government points to (1) Count One's discussion of the Purchase Agreement, which, the government maintains, contemplates events occurring after the export licenses' issuance; (2) references to "Manners and Means" and "Overt Acts" that extended to the statutory period; and (3) references in Paragraph 43 to March 1995. Although the language on which the government relies may point to possible ambiguities in the indictment, the court must construe the indictment in light of its principal purposes of clarity and notice. *See Russell,* 369 U.S. at 769–71, 82 S.Ct. 1038; *Stirone,* 361 U.S. at 215–16, 80 S.Ct. 270; *Lawton,* 995 F.2d at 292–93. Consequent-

---

**9.** We assume that, as alleged in Paragraph 47(b), destination "red" referred to Shanghai, China, and destination "black" referred to Xinyang, China.

ly, we adhere to the indictment's plain language.[10]

**B. Nature of the Purchase Agreement.** The government points to two factors to demonstrate that the Purchase Agreement reflected the broader goal of exporting the machinery. First, it contends that the title of the subheading "Scheme to Insure Completion of the Contract" in Paragraph 43 indicates a "scheme that would culminate in the shipment of the tools to locations selected by CATIC without regard for the license requirements." Appellant's Reply Br. at 13. Insofar as the objective of the sale was to get the machine tools to China, the government maintains, the contract would not be completed until CATIC received the machinery and all parties therefore received the benefits of the transaction. Second, the government points to language in the "Goal" paragraph to indicate that, in accord with the Purchase Agreement, the parties contemplated the machinery's export. Neither contention is convincing.

In the government's view, the subheading "Scheme to Insure Completion of the Contract" refers to a Purchase Agreement that contemplated the delivery of the machine tools to China and that regarded the export licenses simply as a means for com-

pleting the transaction.[11] The subheading, the government maintains, relates directly to the background discussion of the Purchase Agreement in Paragraphs 1 through 42 of the indictment, where the Grand Jury described MDC's desire to maintain good relations with its customer. The government further maintains that the Purchase Agreement itself contemplated the export of the machinery: The Agreement provided that MDC would "obtain the [export] licenses and, in the event they failed to obtain [them], [MDC] was required to buyback [sic] the tools." Count One ¶ 39(1). Moreover, the government continues, the Purchase Agreement contemplated obligations for the parties that arose after the export licenses were issued: CATIC, for example, was to assume shipping costs, and each party was responsible for paying the taxes in its respective country.

There are insurmountable obstacles to the government's reliance on the background discussion in Paragraphs 1 through 42. Count One begins with an "INTRODUCTION," stating, "On or about September 14, 1994, the United States Department of Commerce granted 10 export licenses . . . ." Count One ¶ 1. After a discussion of the regulatory framework for

---

10. Our dissenting colleague would interpret the language on which the government relies as an indication that "the charged conspiracy included the shipment and delivery of machine tools." Dissenting Op. at 1026. The plain language of the indictment, however, does not support such a conclusion. Unlike *Forman v. United States*, 361 U.S. 416, 80 S.Ct. 481, 4 L.Ed.2d 412 (1960), where the Supreme Court interpreted specific language in an indictment to charge a continuing conspiracy to evade taxation, *see id.* at 423, 80 S.Ct. 481; Dissenting Op. at 1031–32, the Grand Jury in the instant case explicitly confined the conspiracy's goal to "obtain[ing] export licenses." Count One ¶ 44. Contrary to the view of the dissent, *see* Dissenting Op. at 1028–29, the possible ambiguities in the

indictment arise not from this clear statement of the goal, but rather from Count One's references to events occurring after the licenses were issued. Although the dissent relies on the indictment's inclusion of these events to argue that a broader conspiracy existed, the dissent points to no action or event within the statutory period that was agreed upon by both parties.

11. We do not reach the government's contention that the district court incorrectly treated the text of this subheading as surplusage. *See Hitt,* 107 F.Supp.2d at 32 n. 3. Even if this was error, we are unconvinced that the "scheme" to which the phrase refers contemplates actions occurring after the issuance of the export licenses.

export controls, *see* Count One ¶¶ 2–6, and a description of the sensitive equipment at issue, *see* Count One ¶ 7, and the parties to the transaction, *see* Count One ¶¶ 8–17, the narration of events in the "Background" section, *see* Count One ¶¶ 18–42, ends with the issuance of the export licenses. These temporal limitations indicate the Grand Jury's focus on the licensing process, not on events subsequent to the licenses' issuance. Such subsequent events, including the payment of taxes and inspections required by the licenses, were collateral actions that were not part of the shared scheme nor threatening to the success of that scheme. *See Schmuck*, 489 U.S. at 711–14, 109 S.Ct. 1443.

As to the Purchase Agreement, the Grand Jury found it relevant to refer to only three of its provisions: (1) the sale price of $5.4 million; (2) MDC's obligation to obtain export licenses where required and, "in the event they failed . . .[,] buy-back [sic] the tools;" and (3) MDC's obligation to pay for storage if any machine tools had not received an export license by July 5, 1994, the deadline for CATIC's removal of the equipment from the Columbus plant. Count One ¶ 39. The Grand Jury alluded to no contractual provision involving the shipment of the machine tools once the export licenses were issued. Indeed, under the terms of the Purchase Agreement, the contract would be completed once the licenses were issued, not when the machinery was delivered. Title would pass after the licenses were obtained, and after MDC received the final payment (by July 1994), not upon the equipment's arrival in China. Furthermore, upon issuance

of the export licenses, the buy-back provision (which was the last contingency to the sale) would be eliminated. Hence, even if the Grand Jury had incorporated all provisions of the Purchase Agreement into Count One, the government could not support its view that "issuance of the licenses did not complete the commercial transaction." Appellant's Br. at 18. Moreover, as Hitt observes in his brief, the Purchase Agreement required CATIC to export the machine tools "in accordance with the export licenses." A "scheme to insure completion of the contract" would therefore contradict the government's "essential claim—that the defendants conspired to assist CATIC's effort to violate the licenses." Appellee's Br. at 48.

Second, the government contends that the language in the "Goal" paragraph of Count One clarifies the parties' intention to export the machinery. The government points to the first sentence of Paragraph 44, which states that "[a] goal of the conspiracy was to obtain export licenses *allowing the sale and exportation of machine tools to [China]*." (emphasis added) An analysis of Paragraph 44 as a whole, however, indicates that the government's reliance on the emphasized phrase is misplaced.[12] The phrase on which the government relies modifies the word "licenses," not the word "goal"; this again indicates that the focus of the conspiracy charge was the licensing process. More significant, however, is the language that follows the first sentence of Paragraph 44. The paragraph proceeds to describe the different purposes of the American and the Chinese

---

12. The plausibility of the dissent's interpretation assigning a "broader meaning" to the goal stated in Paragraph 44, *see* Dissenting Op. at 3, arises not from the language of the indictment, but rather from an intuitive belief that all conspirators must have been aware of CATIC's ultimate purpose. The dissent cannot point to language in Count One that sub-

stantiates that intuitive belief because none of the events occurring within the statutory period implies actions that were agreed upon by the parties. Thus, the dissent's broader interpretation of the conspiratorial "goal" would fail to satisfy the indictment's key purposes of clarity and notice. *See Russell*, 369 U.S. at 765–77, 82 S.Ct. 1038.

defendants: "[The CATIC defendants'] purpose, among others, was to obtain the ... machine tools for unrestricted use at undisclosed facilities within [China]." Count One ¶ 44. The MDC defendants' (including Hitt's) purposes, among others, were (1) to maintain a positive commercial relationship with CATIC and (2) to obtain the export licenses. *See id.*

■ In view of the indictment's key purpose—to provide notice to Hitt of the charges against which he should be prepared to defend himself at trial, *see Russell*, 369 U.S. at 769–71, 82 S.Ct. 1038; *Stirone*, 361 U.S. at 216, 80 S.Ct. 270; *Lawton*, 995 F.2d at 292–93—the district court properly placed great importance on the Grand Jury's separate statement of the purposes of each group of defendants, and its clear statement in Paragraph 44 that the goal of the conspiracy was to obtain the export licenses.[13] *See Hitt*, 107 F.Supp.2d at 32–33. The purposes of the MDC defendants coincided with those of the CATIC defendants only with respect to the export licensing process, which was the only aspect of the transaction in which the MDC defendants were involved. The CATIC defendants' purposes, which extended beyond the common goal of the conspiracy, therefore cannot serve to broaden the definition of the conspiratorial agreement. As this court observed in *Wilson*, 160 F.3d at 737–38, the motivation of a single conspirator does not necessarily define the common goal of the conspiracy.

**C. "Manners and Means" and "Overt Acts."** The government also looks to the "Manners and Means" and "Overt Acts" paragraphs of Count One for support of its broad definition of the scope of the conspiracy. The introductory paragraph under "Manners and Means" states that all defendants (including Hitt) "would and did use the following manner and means, among others, *in seeking to achieve the goal of the conspiracy.*" Count One ¶ 45 (emphasis added). The government contends that all of the manners and means listed in Paragraphs 47 through 50, including actions taken and information concealed "from in or about February, 1993 ... to in or about March 1995," Count One ¶ 46, were in furtherance of "the" goal of the conspiracy. *See* Count One ¶¶ 47–50. In addition, the government points to five overt acts listed in Paragraph 51 that occurred within the statutory period. *See* Count One ¶ 51(21)-(25). We are unpersuaded that the language under either of these headings expands the scope of the conspiracy.

The government's reliance on the "Manners and Means" paragraphs is misplaced. First, the introductory sentence refers to "the" goal of the conspiracy. *See* Count One ¶ 45. The only goal defined by the Grand Jury appears in Paragraph 44: "to obtain export licenses." Count One ¶ 44. The Grand Jury did not state the goal in terms of ensuring completion of the Purchase Agreement or diversion of machinery once it arrived in China. Hence, this

---

**13.** The government contends that the separate "purposes" listed in Paragraph 44 simply set forth the parties' distinct motivations for entering the ultimate agreement—to divert the machine tools for use at unauthorized locations in China. This broader goal, however, is inconsistent with the Grand Jury's description of MDC's motivation. MDC would satisfy its purpose of maintaining a favorable relationship with CATIC only by performing the acts that were under its control, namely sell-

ing the machine tools to CATIC and applying for the export licenses necessary to complete the sale. The dissent would hold that by documenting CATIC's removal of the machine tools from the Columbus plant, MDC "concretely and actively helped CATIC realize the shared goal of delivery to China." Dissenting Op. at 1029. That MDC later helped CATIC realize its ultimate goal is distinct from indicating that MDC shared this goal for purposes of the conspiracy defined by the Grand Jury.

introductory sentence cannot redefine or expand the scope of the conspiracy. Second, as in the "Goal" paragraph, the "Manners and Means" paragraphs distinguish between the activities of the MDC and CATIC defendants. *See* Count One ¶¶ 47–50. From Count One's repeated distinction between the actions and goals of each group of defendants, it reasonably follows that the manners and means attributed to CATIC were not in furtherance of the alleged conspirators' common goal. Finally, the structure of the "Manners and Means" paragraphs indicates that the inclusion of events occurring after September 14, 1994, and of the parties' alleged concealment of shipping information, were intended to illustrate the defendants' false statements and misrepresentations "[o]n the applications for the ten export licenses." Count One ¶ 49; *see also* Count One ¶¶ 47–48. Paragraphs 47 and 48—entitled "False Statements Regarding the End User" and "False Statements Regarding the End Use"—include references to actions by CATIC occurring within the statutory period and as late as March 25, 1995. *See, e.g.,* Count One ¶¶ 47(*l*)-(n). These events, however, are submitted in support of the contention that CATIC "well knew [its statements] to be false and misleading at the time the applications were filed." Count One ¶ 47. Similarly, Paragraphs 49 and 50—entitled "False Statements and [O]missions [R]egarding the [E]nd [U]ser" and "False Statements and Omissions Regarding End Use"—refer to MDC's alleged concealment of shipping information indicating an alternative delivery site for the machine tools. *See, e.g.,* Count One ¶¶ 49(b), (d). Contrary to the government's contentions, this does not indicate that CATIC's shipment and diversion of the machine tools furthered the conspiratorial goal. Rather, MDC's alleged acts of concealment support the conclusions set forth at the beginning of Paragraphs 49 and 50: first, that "[o]n the applications

for the ten export licenses [MDC] certified ... the end user[] to be the CATIC Machining Company ... in Beijing, when in truth and in fact, they knew, had reason to know and acted with willful blindness to the fact that this end user designation was false and misleading," Count One ¶ 49; and second, that MDC's export justification statement "identif[ied] the trunkline program as the end use, when in truth and in fact, [MDC] knew, had reason to know and acted with willful blindness to the fact that this end use designation was false and misleading." Count One ¶ 50.

■ The government further relies on the indictment's inclusion of Overt Acts No. 21 through 25, which occurred within the statutory period. *See* Count One ¶ 51(21)-(25); *supra* Part II.A. These five overt acts, however, do not in themselves extend the scope of the conspiracy into the statutory period unless the acts were committed in furtherance of the alleged conspirators' common goal. *See Grunewald,* 353 U.S. at 397, 77 S.Ct. 963; *Fiswick,* 329 U.S. at 216–17, 67 S.Ct. 224; *Craft,* 105 F.3d at 1128–29; *Roshko,* 969 F.2d at 6–9; *United States v. Davis,* 533 F.2d 921, 926–29 (5th Cir.1976). Only then could a jury properly be allowed to determine whether the overt acts in question actually furthered the common goal of the conspiracy. *See Wilson,* 26 F.3d at 159 (citing cases). Overt Acts No. 21 through 25 do not satisfy this threshold requirement. Rather, they are only consistent with the purpose that the indictment attributed to the CATIC defendants: to divert delivery of machinery to unauthorized locations. As previously discussed, Overt Acts No. 22 through 25 relate to CATIC's diversion of the equipment to unauthorized locations; Overt Act No. 21, the only overt act within the statutory period that refers to MDC at all, merely discusses MDC's internal documentation of CATIC's contractually-obligated removal of the equipment from the Columbus plant. Hence, none of these five

overt acts was in furtherance of the only common goal stated in the indictment: the issuance of export licenses. As a result, inclusion of Overt Acts No. 21 through 25 in the indictment is insufficient to extend the conspiracy beyond the goal stated in Paragraph 44. *See Craft*, 105 F.3d at 1128.

**D. Reference in Paragraph 43 to March 1995.** The government's final contention focuses on the introductory sentence of Paragraph 43 under "Scheme to Insure Completion of the Contract," which states that the conspiracy spanned from "in or about February, 1993 . . . until in or about March 1995." Count One ¶ 43. Because Paragraph 43 does not provide insight as to the conspirators' common goal, however, it cannot by itself expand the conspiracy to reach the statutory period.

Paragraph 43 is the only paragraph in the indictment that seeks to describe the agreement among the parties. Indeed, it is the only paragraph in which the indictment uses the word "agree." *See* Count One ¶ 43. The paragraph proceeds to charge a criminal agreement among the alleged conspirators to commit five offenses against the United States, in viola-

tion of 18 U.S.C. § 371. *See supra* Part II.A. The government contends that "[e]ach of the underlying statutory violations subsumed within the conspiratorial agreement reflects the conspirators' endeavor to secure the delivery of the tools to China in accordance with CATIC's wishes." Appellant's Br. at 30. This scheme, the government maintains, continues "as long as the parties derive [its] anticipated economic benefits." *Id.*

A reading of the plain language of the indictment does not support the government's contentions. First, paragraphs 43(d) and (e) are expressly limited to acts that took place "on or before August 20, 1994," and therefore refer to events occurring outside the limitations period.[14] Second, Paragraph 43(b) charges the defendants with fraudulent actions concerning the export licenses, and thus cannot be construed to extend beyond the point when the licenses were issued. Third, Paragraph 43(c), although worded more broadly, focuses on the defendants' efforts to "defraud" the United States, an act that, as the district court concluded, could only occur in reference to the export licenses that the United States granted.[15] *See*

---

**14.** The government contends that Paragraphs 43(d) and (e) should not be limited to August 20, 1994, because Paragraph 3 states that "the system of export controls established pursuant to the Export Administration Act and implemented by the Export Administration Regulations was continued in effect pursuant to a series of Executive Orders," namely Executive Order 12924, 59 Fed. Reg. 43437 (1994). Again, the court's obligation is to adhere to the plain language of the indictment to ensure that the defendant has received adequate notice of the charges brought against him. *See Russell*, 369 U.S. at 762–69, 82 S.Ct. 1038. Neither Paragraph 43(d) or (e) charges a violation of E.O. 12924 or of Section 203 of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1702 (1991), which provides the statutory authority for the continued enforcement of the EAA's export restrictions. The plain lan-

guage of Paragraphs 43(d) and (e) thus indicates that the Grand Jury charged offenses that occurred on or before the EAA's expiration.

**15.** Paragraph 43(c) states that the defendants, including Hitt, conspired

> to use interstate wire communications, the mail and interstate carriers in furtherance of a scheme to defraud and to obtain property, that is export licenses and machine tools for delivery to [China], by means of false and fraudulent . . . representations . . .

in violation of [18 U.S.C. § 1343 and 1341]. The government concedes that MDC and Hitt could not logically have conspired to obtain "machine tools for delivery to [China]," because MDC already owned the tools. *See* Appellant's Br. at 26 n.8. The government contends, however, that MDC and CATIC

*Hitt,* 107 F.Supp.2d at 35–36. This only leaves the boilerplate language of Paragraph 43(a), which tracks the language of 18 U.S.C. § 1001. *See Hitt,* 107 F.Supp.2d at 35. Absent specific allegations in the indictment concerning a broader scope of the conspiracy, this cannot serve as a catch-all, umbrella section for the government. The government, as it has been warned, "cannot simply charge an offense by using the general language of the statute or the common law, but must accompany the generic language 'with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.' "[16] *Treadwell,* 760 F.2d at 337 (quoting *Hamling,* 418 U.S. at 117–18, 94 S.Ct. 2887).

■ Nor may the government rely on the "economic benefits" theory, under which the "scheme" is deemed to extend until the conspirators receive the economic rewards of the agreement. *See, e.g., United States v. Northern Improvement Co.,* 814 F.2d 540, 542 (8th Cir.1987); *United States v. Mennuti,* 679 F.2d 1032, 1035 (2d Cir.1982); *United States v. Walker,* 653 F.2d 1343, 1347–48 (9th Cir.1981). In the instant case, the anticipated economic benefits of the "scheme" would extend the duration of the conspiracy only if all defendants contemplated those benefits and agreed to receive them. *See Girard,* 744 F.2d at 1171–74. As discussed, the plain language of the indictment indicates that only the CATIC defendants intended to divert the machinery to an unauthorized location in China. Under the indictment, this economic reward of the transaction was not agreed upon by all defendants and therefore may not be used as a basis to extend the scope of the conspiracy.

■ For these reasons, we conclude that a common-sense reading of the indictment indicates that the Grand Jury defined a conspiracy that ended with the Department of Commerce's issuance of the export licenses. It is clear from the indictment why MDC and Hitt participated in the fraudulent scheme to obtain the export licenses: They sought to maintain good relations with the Chinese government, especially in light of the substantial financial gain represented by the MDC–CATIC joint venture. MDC would satisfy this objective by selling to CATIC the equipment that it desired, and by obtaining the

conspired to "deprive the United States of its ability to control the export of these tools . . . by submitting false license applications." *Id.* Hitt responds that the government's claim under 18 U.S.C. §§ 1343 and 1341 is foreclosed by *Cleveland v. United States,* 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000), which states that licenses "do[ ] not create a property interest." *See id.* at 372. Because Hitt sought dismissal of Count One on statute of limitations grounds, we have no occasion to decide whether the mail and wire fraud statutes apply or whether export licenses constitute property under *Cleveland.*

**16.** The government further contends that the term "conceal" in Paragraphs 43(a) and (b) and the charged violation of 15 C.F.R. § 787.5 in Paragraph 43(b) broaden the scope of the conspiracy because they charge MDC and Hitt with failing to disclose changes of material fact to licensing officials even after the export licenses were issued. As discussed *infra* Part II.C, in Count One the Grand Jury alleged concealment not as independent acts in furtherance of the conspiracy, but rather in support of its conclusion that MDC and Hitt provided false and misleading information in the export license applications. Furthermore, the obligations imposed by 15 C.F.R. § 787.5 are triggered upon a "change of material fact or intention" occurring after MDC submitted the export license applications. 15 C.F.R. § 787.5(a)(3). No such change is alleged in Count One; rather, the false information that is the basis of the conspiracy charge was known to the defendants before they submitted the export license applications. Thus, Paragraph 43(b)'s reference to 15 C.F.R. § 787.5 does not expand the conspiracy to actions occurring after the licenses were issued.

export licenses that would allow CATIC to transport the machinery to China. Under the Purchase Agreement, that would complete the transaction, as CATIC was responsible for the machinery's removal and transportation. Although the consequence of MDC's alleged fraudulent acquisition of the export licenses might be CATIC's unauthorized use of the machinery, this does not indicate that CATIC's actions upon acquiring the machine tools would be part of the conspiratorial agreement. As the Supreme Court explained in *Fiswick*, "[t]hough the result of a conspiracy may be continuing, the conspiracy does not thereby become a continuing one . . . '[C]ontinuous co-operation of the conspirators to keep it up' is necessary." 329 U.S. at 216, 67 S.Ct. 224 (citations omitted); *see also United States v. Doherty*, 867 F.2d 47, 61–62 (1st Cir.1989).

The government is hardly unaware of the inconsistency in its attempt to expand the scope of the conspiratorial agreement beyond the plain language of the indictment. In response to questioning during oral argument, the government claimed that the conspiracy charge would remain valid even if an intervening event—such as the sinking of the ship that transported the equipment or a change of heart by the Chinese government—impeded the actual delivery of the machinery to the unauthorized locations. If delivery or shipment of the machinery was unnecessary to the common goal of the conspirators, then by definition the government cannot extend the conspiracy past the issuance of the export licenses. Thus, the government may not rely on Overt Acts No. 21 through 25, and on Count One's sporadic references to events within the statutory peri-

od, to expand the conspiracy or modify its goal.[17] *See Grunewald*, 353 U.S. at 406, 77 S.Ct. 963; *Fiswick*, 329 U.S. at 216–17, 67 S.Ct. 224; *Craft*, 105 F.3d at 1123; *Roshko*, 969 F.2d at 6–8; *Davis*, 533 F.2d at 928. Defining the goal of the conspiracy in the broad manner that the government proposes would frustrate not only the indictment's purpose of giving notice to a defendant, but also the purpose of having a statute of limitations. *See Grunewald*, 353 U.S. at 401–02, 77 S.Ct. 963 (citing *Krulewitch*, 336 U.S. at 455–56, 69 S.Ct. 716 (Jackson, J., concurring)); *Doherty*, 867 F.2d at 61–62. Count One does not allege that the defendants had the common purpose of diverting the machinery to unauthorized locations. If the government envisioned a broader common goal for the conspirators, namely "shipment of the tools to locations selected by CATIC without regard for the license requirements," Appellant's Reply Br. at 13, it was obligated to ensure that the Grand Jury stated that goal with certainty and thereby conformed to the "basic principles of fundamental fairness" underlying the two key purposes of an indictment—notice to the defendant and protection against double jeopardy. *Russell*, 369 U.S. at 763, 765–66, 82 S.Ct. 1038.

Accordingly, we affirm the order of the district court dismissing Count One of the indictment against Hitt.

STEPHEN F. WILLIAMS, Circuit Judge, dissenting:

The indictment—read as a whole—fairly informs the defendant that the charged conspiracy included the shipment and delivery of machine tools and thus included

---

**17.** Insertion of "March 1995" in Count One was apparently an effort to avoid the five-year limitations deadline. MDC executed six waivers of the statute of limitations, "[i]n consideration of the federal government delaying any final decision with respect to the filing of criminal or administrative charges. . . ." Hitt states in his brief that although the government obtained waivers of the statute of limitations from MDC and all but one of the CATIC defendants, it never sought such a waiver from him. *See* Appellee's Br. at 9.

the alleged overt acts committed within the five-year limitations period. I would reverse the district court's dismissal of Count One.

Though the indictment is long, the gist of its story—assumed to be true for these purposes—is simple enough. Facing reduced government business, McDonnell Douglas Corporation, a defense contractor, decided to shut down its military aircraft plant in Columbus, Ohio. After considerable negotiation, McDonnell Douglas agreed to sell for $5.4 million various machine tools from the plant to China National Aero–Technology Import and Export Corporation ("CATIC"), its partner in an ongoing $1 billion joint venture. Indictment, Count One ¶¶ 18, 21–39. Some of the equipment could be legally shipped to China only with export licenses from the Commerce Department; the contract stated that if they could not be obtained McDonnell Douglas would have to buy the equipment back. *Id.* at ¶ 39. Before the deal was made, Robert Hitt, then the Director of the China Program Office at Douglas Aircraft (a wholly-owned division of McDonnell Douglas), was called in to help resolve any problems in obtaining the licenses. *Id.* at ¶ 29. In submissions to the Commerce Department, both contracting parties falsely stated that the tools would be used only in a Beijing facility dedicated to the development of civilian aircraft as part of the joint venture. *Id.* at ¶¶ 41, 50. On September 14, 1994 the Commerce Department granted the licenses. *Id.* at ¶ 42. In November 1994, CATIC arranged, with the help of McDonnell Douglas, to ship the equipment to two different ports (some 600 miles apart) in China. *Id.* at ¶¶ 51(21)-(23). During approximately the next four months, CATIC diverted six machines (licensed for export to Beijing) to a factory in Nanchang. *Id.* at ¶ 51(25). At the request of the Commerce Department, McDonnell Douglas inspected the machine tools in China and reported that the terms

of the licenses had been violated—setting off a Commerce Department investigation that ultimately led to the October 19, 1999 indictment before us. See *United States v. Hitt,* 107 F.Supp.2d 29, 31 (D.D.C.2000).

The key issue here is whether Count One of the indictment alleges a conspiracy continuing beyond October 19, 1994 and is thus properly chargeable under the five-year statute of limitations. See *Fiswick v. United States,* 329 U.S. 211, 216, 67 S.Ct. 224, 91 L.Ed. 196 (1946) (statute "runs from the last overt act during the existence of the conspiracy."). Count One explicitly alleges five overt actions taken after that date, see Count One ¶ 51 (21–25), but these five acts would not count for our purposes unless performed pursuant to the conspiracy. "[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *Grunewald v. United States,* 353 U.S. 391, 397, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). In fact the indictment provides ample signs that the claimed conspiracy extended not merely to the securing of export licenses (issued September 14, 1994) but also to the shipment of the equipment to China through actions that bring the conspiracy well within the five-year window.

\* \* \*

An indictment need not be perfectly crafted to survive judicial scrutiny. "The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, and *sufficiently apprises* the defendant of what he must be prepared to meet." *United States v. Debrow,* 346 U.S. 374, 376, 74 S.Ct. 113, 98

L.Ed. 92 (1953) (internal quotations omitted) (emphasis added). It must "fairly inform[]" the defendant of the charge, *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), and tell him of its nature "with reasonable certainty," *United States v. Simmons,* 96 U.S. 360, 362, 24 L.Ed. 819 (1877). We read the indictment "in its entirety," and construe it "according to common sense with an appreciation of existing realities." *United States v. Inryco, Inc.,* 642 F.2d 290, 294 (9th Cir.1981).

Our specific task is to determine whether the alleged actions within five years of the indictment promoted the object of the alleged conspiracy. The query is similar to resolving claims that a trial court's permissive evidence rulings broadened the indictment. While indictments cannot be "constructively amended" outside of the grand jury (to permit introduction of evidence), they are interpreted reasonably:

> In order to prevail on his claim of constructive amendment, [a defendant] must show that the proof at trial "so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." No constructive amendment occurs "where a generally framed indictment encompasses the specific legal theory or evidence used at trial." Accordingly, we have "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial."

*United States v. Berger,* 224 F.3d 107, 117 (2d Cir.2000)(internal citations omitted). Taken as a whole, this indictment adequately apprises Hitt that the conspiracy extended beyond the receipt of the export licenses and encompassed the shipment of the equipment to China.

A natural starting place is the language explicitly addressing the goal of the conspiracy—"to obtain export licenses *allowing the sale and exportation of machine tools* to [China]." Count One ¶ 44 (emphasis added). Taken alone, this passage is susceptible of the narrow reading assigned by the majority—that the goal was *only* to secure the licenses, with the parties lacking any shared purpose as to actual export or delivery. But the broader meaning asserted by the government is quite plausible. When a person says he wants to obtain "a visa allowing travel to Beijing," the literal reading—that he is indifferent to the use of the visa—is possible but not necessarily likely. That depends on context. The remainder of the indictment, as we shall see, shows that the grand jury was asserting that the parties' jointly intended to get the tools to China. The written contract between McDonnell Douglas and CATIC focused on obtaining the export licenses, to be sure, but parties can be (and often are) accused of having a conspiratorial agreement beyond that memorialized in a legitimate sales deal. There is no parol evidence rule that prevents a criminal agreement from being broader than a contract to which it is related.

Having chosen the narrow reading of the statement of conspiratorial "goal," the majority then discounts everything in the indictment inconsistent with that reading. See Maj. Op. at 1022 (saying that CATIC defendants' alleged purposes "extended beyond the common goal" of the conspiracy and thus cannot "broaden" its definition); 1023 (saying that "Manner and Means" paragraphs cannot "expand" or "redefine" scope of conspiracy because grand jury did not state goal in broad terms); 1023–24 (saying that overt acts cannot be accepted as stated because this would "extend" scope beyond stated goal); 1024 (saying that stated duration

of conspiracy to March 1995 cannot be accepted because it would conflict with alleged goal and would "expand" conspiracy); 1025 (saying that Paragraph 43(a) cannot function as a "catch-all, umbrella section" for the government because of its "generic language"); 1025 (saying that economic benefit to McDonnell Douglas from completing shipment must be disregarded because only CATIC was interested in delivery of the equipment). The more conventional approach, when confronted with an ambiguity, is to assume that other provisions of the document as a whole may shed light on the meaning of the ambiguous passage. Here they do indeed—the statements of purposes, of means and manner, of duration of the conspiracy, and of overt acts all point to the broader meaning. See Count One ¶¶ 1, 43–50, 51(21)-(25).

The indictment says that the CATIC defendants—unsurprisingly—cared about shipment: They wanted to get the equipment for "unrestricted use at undisclosed facilities within [China], including Nanchang, a factory known for its military production." *Id.* at ¶ 44. And McDonnell Douglas and Hitt are explicitly said to have purposes that would extend beyond the issuance of the licenses: They wanted to "maintain the ongoing commercial relationship between McDonnell Douglas and CATIC and to promote the prospects for existing and future business contacts between the parties." *Id.* Obviously McDonnell Douglas's purpose of maintaining a favorable commercial relationship with CATIC would have been thwarted if the licenses were obtained but never used; thus McDonnell Douglas's alleged purpose

fits the broader meaning, and *only* the broader meaning, of the stated goal.

The majority asserts that McDonnell Douglas "would satisfy its purpose ... *only* by performing the acts that were under its control, namely selling the machine tools to CATIC and applying for the export licenses necessary to complete the sale." Maj. Op. at 1022 n.13 (emphasis added). This reflects a mistaken idea of what was under McDonnell Douglas's control. In fact the indictment explicitly alleges an affirmative post-October 19, 1994 act that *was* under McDonnell Douglas's control, namely filling out forms coded to get the equipment to the two intended sites in China. See Count One ¶ 51 (21) (November 2, 1994 act); see also *id.* at ¶ 47(b) (explaining coding system). Thus McDonnell Douglas concretely and actively helped CATIC realize the shared goal of delivery to China.

Moreover, at least until the licenses were *used,* McDonnell Douglas could advance the joint interests of the alleged conspirators by keeping quiet. The indictment includes an allegation of "conceal[ing]" by trick, scheme or device material facts in the jurisdiction of the executive branch (Count One ¶ 43(a)) in violation of 18 U.S.C. § 1001 and asserts that the conspiracy went on until March 1995 (Count One § 51 (25)), when the tools were delivered to Nanchang.[1] The majority nonetheless throws out the period of shipment and delivery on the ground that inclusion of the period needed for the conspirators to reap the full benefits could properly "extend the duration of the conspiracy only if all de-

---

1. The indictment also explicitly alleges violation of 15 CFR § 787.5, which imposes a continuing obligation to disclose: "Every person who has made any representation, statement, or certification must notify, in writing, the Bureau of Export Administration ... of any change of any material fact or intention

from that previously represented, stated, or certified." 15 CFR § 787.5(a)(3); see also 55 Fed. Reg. 31,176 (1990). Because this reference is located in a subsection that appears to be focused on "obtaining" the licenses, Count One § 43(b), I do not rely on it.

fendants contemplated those benefits and agreed to receive them." Maj. Op. at 1025. But McDonnell Douglas's benefits *included* the relationship enhancement that completed shipment would bring, and in any event the cases allow inclusion of the period needed for *each* conspirator to receive his or her share of the benefits. See *United States v. Mennuti,* 679 F.2d 1032, 1036 (2d Cir.1982) ("Similarly, even if the main objective of the conspiracy in this case was to defraud [the insurance company], the conspiracy continued until its other objectives, including [one co-conspirator's] own payoff, were achieved."). And, given that the scheme of deceit and concealment is alleged to have culminated in a specific event (i.e., the delivery occurring in March 1995), there is no risk of defendants' being charged with an eternal conspiracy. Properly understood, the indictment thus falls easily on the permissible side of the line drawn by then-Judge Breyer in *United States v. Doherty,* 867 F.2d 47 (1st Cir.1989), distinguishing between receiving the fruits of an enterprise in "one action, or a handful of actions, taking place over a limited period of time," *id.* at 61, and receiving them in the form of a "lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions, such as receiving salary payments," *id.* The former is permissible, the latter often not. Here the indictment is of the former type.

From the government's acknowledgment at oral argument that the indictment would remain valid even if the ship containing the equipment sank before it reached China, the majority concludes that "[i]f delivery or shipment of the machinery was unnecessary to the common goal of the conspirators, then by definition the government cannot extend the conspiracy past the issuance of the export licenses." Maj. Op. at 1026. On this basis, the ma-

jority simply reads out of the indictment all five post-October 19, 1994 overt acts. *Id.* But the government did not say that the shipment was unnecessary to achieve the conspiracy's goal; it said only that the indictment would still be valid if the shipment were not successful. See Oral Argument Tr. at 10. This reflects a standard truth of conspiracy law: One can be convicted of conspiracy even if the goal is not realized, so long as there is an overt act in furtherance of the goal. See *United States v. Treadwell,* 760 F.2d 327, 333 (D.C.Cir.1985); Wayne R. LaFave, Modern Criminal Law 645 (2d ed. 1988). The sunk ship hypothetical is relevant only in that such a sinking would, in all likelihood, have conclusively thwarted the parties' shared goal, thus ending the conspiracy. If that had occurred more than five years prior to indictment, the indictment for conspiracy would be time barred. But no ship sank, and indeed the equipment didn't even leave Ohio until after the key date of October 19, 1994.

Most telling is the indictment's list of overt acts, expressly stated by the indictment to be "*[i]n furtherance of the conspiracy and to accomplish the objects thereof.*" Count One ¶ 51 (emphasis added). Five of the listed acts—including the shipment and diversion of the tools—plainly occurred after October 1994, within the statute of limitations for conspiracy. See *id.* at ¶ ¶ 51(21)-(25). Though the majority suggests otherwise, see Maj. Op. at 1019, 1020 n.10, it is irrelevant (1) that Hitt did not personally perform any of these acts, (2) that the records executed in Overt Act 21 are internal McDonnell Douglas records, (3) that four out of five acts relate to CATIC's shipping efforts, and (4) that the parties did not agree specifically as to each of the acts. When parties join a scheme, they become responsible for the entirety of its execution, "joined together by their

knowledge of its essential features and broad scope," *Blumenthal v. United States,* 332 U.S. 539, 558, 68 S.Ct. 248, 92 L.Ed. 154 (1947), and either party's ignorance of the details of the overt acts committed by the other is of no consequence. *Id.* See also *Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Curry,* 977 F.2d 1042, 1058 (7th Cir.1992) ("The government is not required to prove any overt acts with regard to a particular defendant within the limitations period; instead, the government is required to prove that the conspiracy existed into the limitations period and that the defendants did not withdraw before that period.").

The majority refuses to read the indictment as a whole when it argues that these acts are not in furtherance of the conspiracy because they do not relate to the receipt of the export licenses. See Maj. Op. at 1024. Although overt acts cannot extend the scope of the conspiracy unless they were committed in furtherance of a common goal, see *id.,* an indictment's allegations of overt acts can help interpret its other language. Accord *Williamson v. United States,* 207 U.S. 425, 458, 28 S.Ct. 163, 52 L.Ed. 278 (1908) (using limited character of alleged overt acts to support narrow reading of remainder of indictment). Since only a single conspiracy is charged, the majority's reasoning implies that the grand jury's inclusion of these acts was unnecessary or mistaken. But we should not excise part of the indictment lightly. See *United States v. Rezaq,* 134 F.3d 1121, 1134 (D.C.Cir.1998) ("[A] motion to strike surplusage [from the indictment] should be granted only if it is clear that the allegations are not relevant ... "; "Rule 7(d) has been strictly construed against striking surplusage.") (internal quotations and citations omitted).

The Manner and Means section of the indictment is in full accord. The grand jury alleged that "in seeking to achieve the goal of the conspiracy" CATIC "did ship the equipment to locations not reflected in such export applications," and McDonnell Douglas and Hitt concealed from the government "that separate packing instructions, designating two ports of delivery, were being employed for all of the licensable machine tools." Count One ¶¶ 45, 47, 49(b)(2). The majority discards the allegedly false statements made to the Commerce Department and other activities after the licenses were issued, using the now familiar argument that these couldn't have been in fulfillment of the conspiracy's goal, as narrowly construed by the majority. See Maj. Op. at 1022–23. But the indictment specifies that the conduct described under Manners and Means was to "achieve the goal of the conspiracy." The necessary implication is that the better reading of the "goal" statement is the broader one encompassing efforts to deliver the goods.

Finally, the indictment states in at least three places that the conspiracy ended in or around March 1995. Count One ¶¶ 43, 47(n), 51(25). In *Forman v. United States,* 361 U.S. 416, 80 S.Ct. 481, 4 L.Ed.2d 412 (1960), *overruled on other grounds, Burks v. United States,* 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), the Supreme Court was similarly confronted with an ambiguous indictment that alleged its duration in years and asserted some overt acts even in the year of indictment. It explicitly relied on the overt acts to resolve the ambiguity. See 361 U.S. at 423, 80 S.Ct. 481.

\* \* \*

Robert Hitt may be entirely innocent of the charges. Or the government may in fact be unable to prove his joinder in the broader goal of the conspiracy and thus his complicity in the activities after issuance of the licenses. But the indictment's unequivocal assertions of McDonnell Doug-

las's purposes, of the conspiracy's duration, of the manner and means of execution that involve completion of the shipment, and of the overt acts looking to that completion plainly resolve the indictment's ambiguous statement of the conspiracy's goal, making clear that it charges a conspiracy reaching into the five-year window. Since the indictment adequately apprised Hitt of the scope of the charged conspiracy, the statute of limitations defense cannot properly rest on its language.